UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

*D/F*

-----------------------------------------------------------------X

BALDASSARE AMATO,

                         Petitioner,

      -against-

UNITED STATES OF AMERICA,

                        Respondent.

**MEMORANDUM & ORDER**

**11-CV-5355 (NGG)**

-----------------------------------------------------------------X

UNITED STATES OF AMERICA,

        -against-

                             **03-CR-1382-13 (NGG)**

BALDASSARE AMATO,

                       Defendant.

-----------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

      Before the court is Petitioner Baldassare "Baldo" Amato's petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2255 (the "Petition"). (Pet. (Dkt. 1).)[1]  Petitioner asserts nine

claims, but his principal argument is that he received ineffective assistance of counsel at trial and

on direct appeal.  For the reasons stated below, the Petition is DISMISSED.

## I.    BACKGROUND

      The sections that follow review Petitioner's criminal charges, trial, and direct appeal.

The court assumes the parties' familiarity with the extensive underlying proceedings, and

summarizes the record only to the extent necessary for the court's habeas review.

---

[1] Unless otherwise indicated, all record citations refer to Petitioner's habeas docket, Case No. 11-CV-5355.  The
court uses "Trial Dkt." to indicate citations to Petitioner's criminal trial docket, Case No. 03-CR-1382-13.

## A.  The Criminal Charges

In January 2004, the United States of America (the "Government") filed a Superseding Indictment against Petitioner and 27 other individuals, alleging several crimes in connection with the activities of the Bonanno crime family, also known as La Cosa Nostra.  (See generally Superseding Indictment (Trial Dkt. 4).)  The Bonanno family was accused of "generat[ing] money . . . through various criminal activities, including drug trafficking, extortion, illegal gambling, loansharking and robbery.  The members and associates of the Bonanno family also furthered the enterprise's criminal activities by threatening economic injury and . . . physical violence, including murder."  (Id. ¶ 9.)

Petitioner was charged with four counts: one count of racketeering conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (see id. ¶¶ 13-15); and three counts related to illegal gambling enterprises, in violation of 18 U.S.C. §§ 371 and 1955 (see id. ¶¶ 114-17).  The RICO count was based on four predicate acts: the murder of Sebastiano DiFalco and conspiracy thereof (the "DiFalco Murder"); the murder of Robert Perrino and conspiracy thereof (the "Perrino Murder"); illegal gambling activities; and conspiracy to commit robbery.  (Id. ¶¶ 63, 71, 81-86, 100.)

Petitioner's case was consolidated with seven other codefendants' and styled as "Urso I."  (See Feb. 2, 2006, Order (Trial Dkt. 600).)  The only Urso I defendants who proceeded to trial were Petitioner, Anthony Basile, and Steven LoCurto.  These two codefendants faced charges of racketeering conspiracy based on predicate acts of murder, drug distribution, and (for Basile only) loansharking.  (See Revised Indictment for Urso I Defs. (Trial Dkt. 672-1).)

## B.  Trial Counsel's Conflict of Interest

Petitioner was initially represented by counsel appointed under the Criminal Justice Act.  (See Feb. 13, 2004, Min. Entry (Trial Dkt.).)  This representation included the arraignment,

where Petitioner pled "not guilty" to all counts (see Feb. 17, 2004, Min. Entry (Trial Dkt. 67)),

and continued through early discovery and pre-trial motion practice. Petitioner privately retained

Diarmuid White in January 2006. (Not. of Att'y Appearance (Trial Dkt. 577).) White

represented Petitioner thereafter through pre-trial procedures, trial, sentencing, and appeal.

    1.  <u>White's First Letter</u>

    When White filed his notice of appearance, he also filed a letter notifying the court of a

potential conflict of interest based on his prior representation of Joseph Massino, a former

Bonanno family "boss." (Jan. 9, 2006, Ltr. re <u>Curcio</u> Hr'g ("1st White Ltr.") (Trial Dkt. 578);

Superseding Indictment ¶ 8 ("At various times, Joseph Massino was the boss of the Bonanno

family.").) In separate criminal proceedings before this court, Massino had already received

concurrent life sentences for crimes related to the Bonanno family. (See J. (Dkt. 901), <u>United

States v. Massino</u>, No. 02-CR-307-27 (NGG) ("<u>Massino I</u>"); see also <u>United States v. Massino</u>,

No. 03-CR-929-1 (NGG) ("<u>Massino II</u>").) He subsequently became a Government cooperator.

    White explained that he was one of multiple unaffiliated attorneys who supported

Massino's primary defense counsel in the early phases of trial preparation. (1st White Ltr. at 2;

see generally <u>Massino I</u>.) White's engagement lasted approximately eight months. (<u>Id.</u>)

"Massino discharged White prior to [any pre-trial] motions being filed on his behalf." (1st White

Ltr. at 3.) White stated that he could "recall no material information or confidences and secrets

conferred upon [him] by Massino." (<u>Id.</u>)

    Nonetheless, as a precautionary measure, White stated his intention to engage co-counsel,

who would cross-examine Massino if he were to "testify against Amato," an eventuality that was

"by no means certain." (<u>Id.</u> at 1.) "Under these circumstances," White argued that there was "no

'serious potential conflict'" that would require his disqualification, "and likely no potential

conflict at all." (<u>Id.</u> at 3 (quoting the standard for disqualification established in <u>United States v.</u>

3

Schwarz, 283 F.3d 76 (2d Cir. 2002)).)  White concluded that "any potential conflict of interest is clearly waivable," and stated that "defendant Amato is prepared to make any appropriate waivers at a Curcio hearing." (Id. at 2 (internal quotation marks omitted).)  See also United States v. Velez, 354 F.3d 190, 198 (2d Cir. 2004) (The purpose of a Curcio hearing is "to determine whether the defendant knowingly and intelligently waives his right to conflict-free representation." (citing United States v. Curcio, 680 F.2d 881, 888-90 (2d Cir. 1982))).

   2. The January 2006 Status Conference

  The parties discussed White's letter at a status conference on January 23, 2006 (the "January 2006 Status Conference").  The Government explained that Massino was a "potential witness," and that Massino's current counsel had not yet indicated whether Massino would consent to "waive any attorney-client privilege or duty of loyalty, or any duty remaining from Mr. White's representation." (Jan. 2006 Status Conf. Tr. (Dkt. 33-1) at 38:14-19.)  The Government stated its position that, if "[Massino] does not waive that issue, that Mr. White should be disqualified from the case."[2] (Id. at 38:22-24.)  White responded that Massino's "waiver is not required in any respect," and noted that he was not "request[ing] a waiver with respect to the attorney-client privilege." (Id. at 39:10-13.)  White restated his intention that co-counsel would conduct any necessary cross-examination of Massino, and reaffirmed his position that "[t]his is eminently a waivable conflict." (Id. at 39:8-10.)

---

[2] Based on this statement, Petitioner contends that the Government "unequivocally took the position . . . that Mr. White suffered from a disqualifying conflict of interests," and argues that the Government "should be estopped from taking any contrary position" in these habeas proceedings. (Pet'r's July 4, 2013, Ltr. (Dkt. 33) at 4.)  The court disagrees.  A district court is empowered to disqualify an attorney in "cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." United States v. Cain, 671 F.3d 271, 294 (2d Cir. 2012) (quoting Wheat v. United States, 486 U.S. 153, 163 (1988)).  The Government's position in favor of precautionary disqualification before trial—especially when the Government was still considering Massino as a potential witness—does not preclude the Government, on collateral review, from arguing that defense counsel's performance was constitutionally satisfactory.

   3.  White's Second Letter

On February 16, 2006, White sent a letter notifying the court that, "confronted with the reality of a trial" that could last up to three months, Petitioner was "unable to marshal the resources to retain two lawyers." (Feb. 16, 2006, Ltr. re Curcio Waiver ("2d White Ltr.") (Trial Dkt. 609) at 1.)  Consequently, White intended "to try the case without co-counsel and," if necessary, to cross-examine Massino himself.  (Id.)  White acknowledged that he "would not seek to cross-examine Massino based on any privileged communication, unless [Massino] waived the privilege." (Id. at 1-2.)  White maintained that "[t]his modified position . . . [did] not render any potential conflict of interest unwaivable," and reiterated that "Defendant Amato [was] prepared to make all appropriate Curcio waivers."  (Id.)

   4.  Subsequent Developments

The court did not hold a Curcio hearing for Petitioner, nor did either party notify the court of any waivers from Massino regarding White's representation.  (See Gov't Mem. in Opp'n to Pet. ("Gov't Opp'n") (Dkt. 24) at 25; Pet'r's July 4, 2013, Ltr. (Dkt. 33) at 5.)  Before the trial began, the Government stated that it did not intend to call Massino as a witness.  (May 22, 2006, Gov't Mot. in Lim. (Trial Dkt. 713) at 6.)  None of the Urso I defendants called Massino as a defense witness.

**C. Evidence Adduced at Trial Regarding the DiFalco and Perrino Murders**

Petitioner was a "made" member and longtime "soldier" in the Bonanno family.  (See, e.g., Trial Tr.[3] 296:1-2, 335:16-336:6 (testimony of Salvatore Vitale); Tr. 2091:22-2092:3

---

[3] Unless otherwise specified, all citations to "Tr." reference the transcript of Petitioner's criminal trial.  This opinion cites to the following portions of the trial transcript (all dates in 2006): May 31 Trial Tr. 251-463 (Trial Dkt. 1039); June 1 Trial Tr. 464-474 (Trial Dkt. 1040); June 12 Trial Tr. 1001-1187 (Trial Dkt. 1041); June 16 Trial Tr. 1405-1627 (Trial Dkt. 1042); June 19 Trial Tr. 1628-1868 (Trial Dkt. 1046); June 20 Trial Tr. 1871-2144 (Trial Dkt. 1049 (mislabeled on ECF as June 29, 2006)); June 21 Trial Tr. 2129-2425 (Trial Dkt. 1047); June 23 Trial Tr. 2428-2675 (Dkt. 1048); June 26 Trial Tr. 2678-2978 (Trial Dkt. 1033); July 5 Trial Tr. 3386-3519 (Trial Dkt. 1026); July 6 Trial Tr. 3520-3725 (Dkt. 1045).

(testimony of Frank Lino); Tr. 2539:6-10 (testimony of Frank Ambrosino).)  His RICO charge included four predicate acts related to the Bonanno criminal enterprise, but Petitioner's habeas claims focus almost exclusively on the predicate acts of murder and conspiracy to murder as to Sebastiano DiFalco and Robert Perrino.  The following sections summarize the portions of the trial record that relate to Petitioner's habeas claims.  Undisputed background facts are provided without citations to the record.

### 1.  The DiFalco Murder

Samuel "Sammy" DiFalco owned and operated a restaurant (the "Giannini restaurant") that was frequented by members of the Bonanno family.  Various Bonanno members testified that DiFalco was, in fact, Petitioner's associate and that Petitioner had a financial stake in the restaurant.  (See Tr. 382:18-383:6 (Vitale); Tr. 1068:5-13 (Anthony Tabbita); Tr. 1832:19-1833:21 (Lino).)  DiFalco went missing on February 27, 1992.  The police discovered his body three weeks later in the trunk of his daughter's car, which had been reported stolen.  DiFalco had been shot twice in the back of the head.

Petitioner was implicated in the murder by two cooperating witnesses, Salvatore "Sal" Vitale, a former "underboss" of the Bonanno family, and Anthony Tabbita, a former Bonanno "associate."  The Government bolstered its case by arguing that Petitioner acted suspiciously in the days and weeks after DiFalco's disappearance.  White sought to preclude or limit Vitale's testimony.  When those efforts failed, White argued that the Government's case amounted to nothing more than circumstantial evidence.  (Tr. 3622:25-3623:4 (White summation).)  White attacked the credibility and character of key witnesses, posited that certain witnesses had fabricated their accounts in order to cover up their own criminal activity or secure better plea deals from the Government, and offered innocent alternative explanations for Petitioner's allegedly suspicious conduct.

###### a. *Government Witness Sal Vitale*

Vitale was a Bonanno underboss, meaning that he outranked Petitioner in the Bonanno family. Vitale testified that, during a conversation with Massino at an unspecified time in the 1990s, Massino "said that Baldo killed Sam because he thought Sam was robbing from the [Giannini] restaurant." (Tr. 389:11-20.) Vitale's anticipated testimony on this point was the subject of pre-trial motions and a contemporaneous objection during trial. White also sought to undermine Vitale's credibility. The court reviews these legal maneuverings in detail because of their importance for Petitioner's habeas claims.

###### i. *Pre-Trial Motions Concerning Vitale's Testimony*

Before trial, White sought to preclude Vitale's anticipated testimony regarding the conversation with Massino on the grounds that (1) Massino's statement constituted "idle chatter" that did not qualify for the RICO co-conspirator hearsay exception under Federal Rule of Evidence 801(d)(2)(E); (2) admission of Vitale's statement would violate the Confrontation Clause unless the Government could establish that "Massino had [a] sufficient non-hearsay basis for his professed knowledge of the DiFalco murder"; and (3) the testimony should be excluded as unduly prejudicial under Rule 403. (See May 18, 2006, Amato Mot. in Lim. (Trial Dkt. 690).) The court denied White's motion as to Rule 403, finding Massino's statement to be "probative of [Petitioner's involvement in] the racketeering conspiracy" and "not substantially outweighed by unfair prejudice." (May 26, 2006, Mem. & Order (Trial Dkt. 731) at 15.) As to White's other arguments, the court "den[ied the] motion as premature until the direct examination of Salvatore Vitale." (Id.)

Meanwhile, the Government sought to preclude all codefendants from referencing certain handwritten notes made by Massino on FBI "FD-302" reports, the FBI's report format for summarizing interviews. (See May 22, 2006, Gov't Mot. in Lim. at 4.) The Government had

disclosed "various FBI-302 reports" to Massino when he was preparing for his own criminal

trials (before he was convicted and agreed to become a Government cooperator). (Id.)

Vitale's 302 recounted Massino's remark that Petitioner had DiFalco killed because of a

monetary dispute concerning the restaurant. (See Vitale 302 Report (Dkt. 29-12).) "During

[Massino's] trial preparation, Massino made handwritten notes on Vitale's 302 in which he

denied that the conversation ever took place" (the "302 Notes"). (Gov't Opp'n at 26; see also

Vitale 302 Report.)

At Petitioner's trial, the Government sought to "preclude defense reference to the

substance" of the 302 Notes on hearsay grounds, and argued further that "there can be no good

faith basis for believing that any government witness in this trial would have their recollection

refreshed by reviewing Massino's notes." (May 22, 2006, Gov't Mot. in Lim. at 4.) White

responded that he "[did] not intend to refer to [the 302 Notes] if Massino does not testify."

(May 25, 2006, Amato Resp. to Mot. in Lim. (Trial Dkt. 725) at 1.) The court found "that

Joseph Massino's handwritten notes on F.B.I. 302 reports constitute [] out of court statements"

offered to prove the truth of the matter asserted and "are therefore precluded by Rules 801

and 802" of the Federal Rules of Evidence. (May 26, 2006, Mem. & Order at 3.)

White subsequently revised his position in response to the Government's proffered basis

for Massino's knowledge, namely "that Massino spoke to Amato and Amato told him" about the

DiFalco murder. (May 27, 2006, Amato Mot. for Reconsid. (Trial Dkt. 734).) White advised the

court that, should Massino's statement to Vitale be deemed "admissible as a statement of a co-

conspirator in furtherance of the conspiracy," the 302 Notes "would be admissible under [Federal

Rule of Evidence] 806 to attack the credibility of the declarant, Massino." (Id. (citing Fed. R

Evid. 806 (When a co-conspirator statement "has been admitted in evidence, the declarant's

credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness.").)

Finally, White made a request under Brady v. Maryland, 373 U.S. 83 (1963), for the Government to produce "any information, whether reduced to writing or not, reflecting any inconsistency between what Salvatore Vitale has stated Joseph Massino told him about the Sebastiano DiFalco homicide and what Massino has stated about that homicide or his conversation with Vitale concerning it." (May 26, 2006, Amato Brady Mot. (Trial Dkt. 729).) It does not appear that any such information was produced.

ii.    *White's Objection to Vitale's Testimony*

At trial, the Government asked Vitale to describe the conversation he'd had with Massino regarding the circumstances of DiFalco's death. (Tr. 384:1-385:5.) White objected and requested a sidebar, arguing that the Government had failed to establish a non-hearsay basis for Massino's knowledge. (Tr. 385:6-386:7.) White also "ask[ed] for an evidentiary hearing with Joe Massino." (Tr. 386:17-18.) For "something as important as this," White argued, the court could not "just accept a proffer" as to the basis for Massino's knowledge, and should bring him "in here to testify to that at a hearing." (Tr. 386:17-23.)

The Government responded that (1) the testimony could properly be introduced on the grounds that Massino, Vitale, and Petitioner were all co-conspirators in the Bonanno racketeering conspiracy; (2) the Government was not "required to elicit from the witness the basis for Mr. Massino's knowledge"; (3) the Government had "already proffered the basis" for Massino's knowledge, namely that he had spoken to Petitioner; and (4) "it is obvious" that the information would have to have come from within the Bonanno family because "no one outside the crime family [would] tell them" about one Bonanno member killing another. (Tr. 386:8-16,

9

387:7-20; see also May 26, 2006, Gov't Resp. to Mot. in Lim. (Trial Dkt. 728) at 9-10

(previewing these arguments during motions in limine).)

      The court overruled White's objection and denied the request for a hearing. (Tr. 388:11-

12.) After Vitale testified, White renewed his objection with arguments under the Confrontation

Clause and the Due Process Clause, arguing that, because Massino was "available to the

government to call" as a witness, it was "unfair to introduce his statements without calling him."

(Tr. 473:6-11.) The court rejected White's renewed objection in a written opinion. (June 8,

2006, Mem. & Order (Trial Dkt. 770).)

           iii.   *White's Defense Strategy Regarding Vitale's Testimony*

      During White's summation, he warned the jury "to be cautious about" statements

allegedly made by "people who didn't testify." (Tr. 3626:24-25.) He reminded the jury that

Vitale had no personal knowledge of Petitioner's involvement in the DiFalco murder; rather,

Vitale was relying on Massino's word, and Vitale himself had admitted that Massino was a

"calculating" person who lied even to members of the Bonanno family. (Tr. 3623:21-3626:25;

see also Tr. 403:18-405:18, 409:9-18 (Vitale cross-examination).)

      White also spent considerable time attacking Vitale's credibility. White emphasized

repeatedly that Vitale had admitted to participating in eleven murders. (See, e.g., Tr. 3696:9-14,

3698:20, 3703:1-6, 3704:23-24, 3705:3-5 (White summation).) White also characterized Vitale

as a "maestro" of deceit, a "fraud," a man who "minimized his role in everything" and "has no

problem" implicating members of the Bonanno family in order to divert suspicion from his own

activities or to negotiate a better deal with the Government. (Tr. 3694:15-3695:24, 3703:19; see

also Tr. 3696:4-3704:22.)

### b.  Government Witness Anthony Tabbita

Tabbita was "on record" with Petitioner in the early 1990s (Tr. 1059:13-17), meaning that Tabbita was not yet a "made" Bonanno member, and so he participated in Bonanno activities under Petitioner's supervision.  Prior to Petitioner's trial, Tabbita had already implicated Petitioner in the DiFalco murder while testifying in two other criminal trials.  At Petitioner's trial, the Government presented Tabbita with that prior testimony, but Tabbita stated that he did not remember giving it.  (Tr. 1479-82.)  He did, however, testify to the following account. Tabbita was asked by one of Petitioner's known associates to assist with a plot to kill DiFalco. (Tr. 1077:19-23, 1080:14-22.)  Tabbita understood this request to be coming indirectly from Petitioner himself.  (Tr. 1071:10-14, 1080:18-22.)  Tabbita participated in two failed murder attempts against DiFalco (Tr. 1082-86), but was then arrested and convicted on state charges in 1992.  DiFalco was killed while Tabbita was incarcerated.  (Tr. 1087:1-12.)

When asked why Petitioner "wanted [DiFalco] dead," Tabbita said he "believed it was over money."  (Tr. 1087:21-23.)  Tabbita testified that he did not know anyone named Salvatore Vitale.  (Tr. 1088:8-14.)  The Government's summation emphasized that Tabbita and Vitale had offered similar accounts of Petitioner's role in and motive for the DiFalco murder, even though the two witnesses did not know each other and had never discussed these details.  (Tr. 3502:21-3503:5.)

As with Vitale, White went to great lengths to undermine Tabbita's creditability, describing him as a "psychopath" who had pled guilty to multiple murders.  (Tr. 3618:7-12, 3635:24, 3645:5-11 (White summation).)  "[O]f all the witnesses in this trial," White argued that Tabbita was "by far the most untrustworthy."  (Tr. 3636:5-6.)  White also attacked the substance of Tabbita's testimony, arguing that the Government prodded him with leading questions and overstated the significance of his vague or uncertain answers.  (See Tr. 3637:4-3643:23,

11

3648:20-3652:21.) Finally, White suggested that Tabbita had a personal motive to murder DiFalco, and that he was framing Petitioner in an attempt to cover his own tracks. (See Tr. 3648:8-16, 3654:17-3655:21.)

### c. Petitioner's Suspicious Conduct Following DiFalco's Disappearance

As indirect evidence of Petitioner's guilt, the Government elicited testimony regarding Petitioner's conduct in the weeks following DiFalco's disappearance. The Government highlighted four types of allegedly suspicious conduct, all of which White challenged.

### i. The Interview with Nina DiFalco

First, Petitioner allegedly attempted to glean information about the police investigation into DiFalco's disappearance. Shortly after DiFalco was reported missing, Detective John Jacobsen set up a meeting with DiFalco's wife, Nina DiFalco, at her home. (Tr. 1615:22-1616:3 (Jacobsen testimony).) Petitioner was at the DiFalco residence when Detective Jacobsen arrived, and Petitioner sat nearby, "looking in [their] direction," while the detective spoke with Nina DiFalco. (Tr. 1617:5-18.) Detective Jacobsen then questioned Petitioner, who identified himself as the manager of the Giannini restaurant. (Tr. 1617:19-1618:1.) In the Government's summation, they argued that Petitioner lingered during the interview with Nina DiFalco because he "want[ed] to know what the police [were] asking" and "what the police knew" about DiFalco's disappearance. (Tr. 3535:10-12.)

White countered that Petitioner's presence was easily explained by his long friendship with the DiFalco family. (See Tr. 3631:20-3632:21 (White summation) (summarizing testimony as to the friendly relationship between Petitioner and Sammy DiFalco).) In an effort to comfort Nina DiFalco, Petitioner would call every day to see if she had any family members with her, and he would bring food over to the house. (Tr. 3668:1-10.)

12

ii.   *The "False Alibi" Theory*

Second, the Government accused Petitioner of attempting to "create a false alibi."

(Tr. 3546:10-13 (Gov't summation).) Petitioner claimed in two separate police interviews that

he was present at the Giannini restaurant on the night DiFalco disappeared. (Tr. 1619:21-1620:1

(Det. Jacobsen police report); Tr. 1941:17-21 (Det. Vormittag police report).) At trial, however,

Giannini employee Giovanni Annunziati testified that he saw DiFalco at the restaurant on the

day in question, but that he did not remember seeing Petitioner. (Tr. 1666:2-3, 1666:25-1667:1.)

White offered two responses. First, he noted that Annunziati could simply be mistaken

about who was or was not at the restaurant on a particular day 14 years earlier. (Tr. 3670:22-

3671:7.) White further argued that, as a matter of common sense, Petitioner would not have

"lie[d] to a detective who can very easily verify it or find out it's not true," especially "a couple

of days after the event when it was fresh in everybody's mind." (Tr. 3671:8-16.)

iii.   *Petitioner's Remarks to Frank Fiordolino*

Third, the Government emphasized the testimony of cooperating witness Francesco

"Frank" Fiordolino, who described an interaction he had with Petitioner on March 19, 1992, the

day after DiFalco's body was found. Fiordolino was walking on the street when Petitioner called

out from his car and asked Fiordolino whether "any of the [Italian expletives] passed by about

that [Italian expletive]," which Fiordolino understood as an inquiry about whether the police had

been asking around about DiFalco. (Tr. 1835:25-1838:19.) This conversation, the Government

argued, "contradicts" the defense's theory that Petitioner "would never be involved in a []

conspiracy with the murder of DiFalco" because the two men were close friends. (Tr. 3548:5-9

(Gov't summation).) Petitioner "wouldn't refer to Sammy DiFalco, a man who had been missing

for weeks and just the night before had been found stuffed in the back of a car, he wouldn't call

that man a piece of shit unless he was glad he was dead." (Tr. 3553:16-20.)

As with the other witnesses, White impeached Fiordolino's credibility by enumerating his prior criminal offenses. (See Tr. 3627:1-10 (White summation).) More pointedly, White accused Fiordolino of fabricating the conversation with Petitioner in order to have something to "offer to the [G]overnment in trying to get his own cooperation agreement." (Tr. 3662:17-19; see generally Tr. 3660-64.) After highlighting comments from other witnesses about the friendly relationship between Petitioner and DiFalco, White argued that Fiordolino's testimony was "an untruth" and "a slander." (Tr. 3632:24.)

          iv.    *Petitioner's Remarks Regarding Cathy Ventimiglia*

Finally, the Government posited that Petitioner attempted to divert suspicion away from himself and toward a woman named Cathy Ventimiglia, with whom DiFalco had been carrying on an extramarital affair. (Tr. 3546:1-9 (Gov't summation).) Several witnesses testified about conversations following DiFalco's disappearance in which Petitioner commented that DiFalco had plans to meet Ventimiglia on the night he disappeared, or that DiFalco might be missing because he'd run off somewhere with her. (Tr. 1590:18-25 (Nina DiFalco); Tr. 1667:11-25 (Annunziati); Tr. 1646:20-1647:13 (Michael D'Avanzio, a Giannini employee); Tr. 1941:21-1948:20 (Det. Vormittag).)

White characterized these conversations as earnest inquiries by Petitioner, who was trying to help Nina DiFalco by pursuing potential leads as to DiFalco's whereabouts. (Tr. 3667:10-22 (White summation).)

       2.  The Perrino Murder

Robert "Bobby" Perrino, a Bonanno associate, was the superintendent of deliveries at the New York Post. The New York State Police began investigating Perrino's ties to organized crime in early 1992. By Vitale's admission, Perrino was killed in May of that year because Vitale and another Bonanno leader, Anthony Spero, feared that Perrino might become a

14

Government cooperator. (Tr. 313:18-315:5 (Vitale testimony).) Vitale and Spero asked Bonanno member Frank Lino to take on much of the planning, but they made sure that the conspiracy was compartmentalized, with each team isolated from the others and information shared on a "need to know" basis: Lino found a location for the murder, a club owned by Petitioner's codefendant Basile; Michael "Mickey Bats" Cardello was enlisted to transport Perrino to the chosen location; there, Perrino was to be murdered by a shooter selected by Vitale; afterward, teams assembled by Lino were responsible for cleaning up the murder scene and disposing of the body. (Tr. 326:8-14 (Vitale testimony); Tr. 2171:8-12, 2180:22-24 (Lino testimony).) Lino was never told the identity of the shooter, nor did he learn that Perrino was the intended victim until late in the planning process. (Tr. 2183:24-2184:12, 2291:12-2294:1 (Lino testimony).)

The Government accused Petitioner of shooting Perrino, relying on testimony from Vitale and Frank Ambrosino, another cooperating witness.[4] White attempted to impeach both witnesses, calling particular attention to possible ulterior motives for falsely implicating Petitioner in the murder.

### a. Government Witness Sal Vitale

Vitale testified that he and Petitioner met with a Canadian Bonanno affiliate known as "George from Canada" to discuss the possibility of using a Canadian shooter for the Perrino murder. (Tr. 316:7-318:4.) George cautioned, however, "that it was hard to get men across the border from Canada" at that time. (Tr. 320:25-321:2.) George told Vitale that he'd already asked Petitioner about performing the anticipated murder, and Petitioner added, "You bring the

---

[4] The Government also elicited testimony from a number of cooperating witnesses who participated in the Perrino murder but did not know the identity of the shooter, and also presented forensic evidence that corroborated these accounts of when, where, and how Perrino was murdered and his body buried, exhumed, relocated, and reburied. (See Gov't Opp'n at 12 (citing to the record).)

guy, and don't worry about it. I'll take care of it. I'll kill 'im." (Tr. 321:3-7.) The only people who knew that Petitioner was the intended shooter were the three participants at that meeting— George, Vitale, and Petitioner himself—and, later, two other people that Vitale told—Spero, with whom Vitale reached the decision to order the murder (Tr. 321:21-322:12); and Cardello, who was tasked with bringing Perrino to Basile's club, where Petitioner would be waiting (Tr. 326:8-14). George from Canada died before Petitioner's trial. Neither Spero nor Cardello was called to testify.

White focused on impeaching Vitale's credibility and character, as discussed above in Section I.C.1.a.iii. White also elicited testimony to support his theory that Vitale himself killed Perrino and was now implicating Petitioner only in order to "conceal his own involvement." (Tr. 3715:7-8 (White summation).) White argued that Vitale had a personal interest in silencing Perrino because both Vitale and his son were directly involved in Perrino's criminal activities at the New York Post. (Tr. 3704:23-3705:2, 3706:3-16, 3709:10-3715:8.) Vitale carefully "insulated the identity of the shooter from everybody else," White argued, and the only other people who knew about Petitioner's alleged involvement were not called to testify. (Tr. 3713:15-20.) White told the jury that they could properly "infer from the government's failure to call" a given witness that the witness "would not have supported Sal Vitale's testimony." (Tr. 3707:3-7; see also Tr. 3713:15-20.)

### b. Government Witness Frank Ambrosino

Ambrosino testified that he was asked to help "get rid of a body" by arriving at the murder location with tokens for the Verrazano Bridge, thereby facilitating a speedy journey across the Bridge for the body disposal team as they traveled to the designated burial site. (Tr. 2537:1-10.) On the night of the murder, Ambrosino was waiting in a parked car with the tokens, as instructed, when he saw Petitioner "standing outside of Anthony Basile's club," near

16

the entrance. (Tr. 2540:5-13; see also Tr. 2538:23-2539:10.) Ambrosino knew that Petitioner

wasn't part of Lino's cleanup or disposal crews (Tr. 2543:18-19), so Ambrosino ducked out of

sight to protect his own identity as a participant in the murder (Tr. 2540:19-20). When he sat

back up again a few minutes later, Petitioner was no longer there. (Tr. 2541:5-7.)

Shortly thereafter, Ambrosino observed members of Lino's cleanup and disposal teams

entering Basile's club. (Tr. 2541:10-2542:2.) After another few minutes, Lino's brother, Robert,

came out of the club and approached Ambrosino's car. (Tr. 2542:23-25, 2543:8-9.) Ambrosino

said that he'd seen Petitioner outside the club, and Robert replied, "[L]et's just keep that between

you and me." (Tr. 2543:2-4.) An hour later, the disposal team emerged from the club carrying

Perrino's body, which was concealed in a rolled-up rug, and drove the body away in the waiting

car. (Tr. 2544:24-2545:13.)

White challenged Ambrosino's testimony in three ways. He first argued that

Ambrosino's testimony was "manufactured" in order to increase his bargaining power as a

Government cooperator, and that the jury should therefore "reject his testimony out of hand."

(Tr. 3693:4-5 (White summation).) White reviewed the history of Ambrosino's proffers and

concluded that Ambrosino was a "glowing example of how somebody can falsely implicate

somebody in a murder by keeping his ears open, reading what's out there, and going back and

giving the Government information based on what he's already learned about the case."

(Tr. 3694:7-11; see generally Tr. 3686-94.) In the alternative, White suggested the possibility of

simple mistake, noting that Ambrosino claims to have "look[ed] out of his car for just a fleeting

moment and recognize[d] Baldo Amato" before "duck[ing] down in the car." (Tr. 3685:19-22.)

Finally, as with the other cooperating witnesses, White emphasized Ambrosino's criminal

activities, reminding the jury that he had participated in two murders. (Tr. 3686:1-4.)

### D. The Verdict and Sentencing

On July 12, 2006, after a six-week trial, the jury found all defendants guilty on all counts, including a finding that the Government had proven Petitioner guilty of all four predicate acts under the RICO count. (Jury Verdict (Trial Dkt. 914).) On October 27, 2006, the court sentenced Petitioner to life imprisonment, lifetime supervision, and a $250,000 fine. (J. (Trial Dkt. 941).)

### E. Direct Appeal

Petitioner appealed his conviction with White's continued assistance as appellate counsel. (Not. of Appeal (Trial Dkt. 943).) The Second Circuit affirmed the conviction on January 12, 2009, rejecting Petitioner's challenges to (1) the court's instructions regarding the anonymous and partially sequestered jury; (2) an alleged Brady/Giglio violation concerning a sealed submission from the Government during the trial; (3) the court's jury charge with respect to the RICO statute of limitations; (4) the court's corrective instruction regarding an inaccurate statement during the Government's rebuttal summation; and (5) "various [other] evidentiary rulings." United States v. Amato, 306 F. App'x 630, 634-35 (2d Cir. 2009) (summary order).[5]

## II.    HABEAS PETITIONS UNDER 28 U.S.C. § 2255

A federal prisoner may file a petition in the sentencing court "to vacate, set aside, or correct" a conviction or sentence that was imposed "in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). A federal habeas petitioner bears the burden of proof by a preponderance of the evidence. See Triana v. United States, 205 F.3d 36, 40 (2d Cir. 2000).

---

[5] The Second Circuit's opinion is also available on the trial docket. (See Mandate of USCA (Trial Dkt. 1061).) The Second Circuit recalled and stayed this mandate during the pendency of co-appellant LoCurto's request for rehearing, which was ultimately denied. (See Order of USCA (Trial Dkt. 1063), Mandate of USCA (Trial Dkt. 1067).)

This section reviews two procedural bars that preclude certain federal habeas claims, as well as the legal standard governing requests for discovery and evidentiary hearings.

### A. Procedural Bars

"Because collateral challenges are in 'tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.'" Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) (quoting Ciak v. United States, 59 F.3d 296, 301 (2d Cir. 1995), abrogated on other grounds by Mickens v. Taylor, 535 U.S. 162 (2002)).

First, "the so-called mandate rule bars re-litigation of issues already decided on direct appeal," including both "matters expressly decided by the appellate court" and "issues impliedly resolved by the appellate court's mandate." Id. (citations omitted); see also id. at 53-54 (explaining that the mandate rule applies in habeas proceedings under Section 2255).

Second, courts apply a "general rule that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." Massaro v. United States, 538 U.S. 500, 504 (2003) (emphasis added); see also Yick Man Mui, 614 F.3d at 54. This bar does not apply to claims of ineffective assistance of counsel, however. "[T]he Supreme Court has explained that 'in most cases[,] a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance.'" United States v. Rosa, 666 F. App'x 42, 44 (2d Cir. 2016) (summary order) (quoting Massaro, 538 U.S. at 504).

### B. Discovery and Evidentiary Hearings

"A habeas petitioner . . . is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997). "Rather, discovery is allowed only if the district court, acting in its discretion, finds 'good cause'" based on "'specific allegations'" that give "'reason to believe that the petitioner may, if the facts are fully developed, be able to

19

demonstrate that he is entitled to relief.'" Ferranti v. United States, 480 F. App'x 634, 638

(2d Cir. 2012) (summary order) (alterations omitted) (quoting Bracy, 520 U.S. at 908-09).

Courts are directed to hold evidentiary hearings in proceedings under Section 2255

"[u]nless the motion and the files and records of the case conclusively show that the prisoner is

entitled to no relief." 28 U.S.C. § 2255(b). "A [petitioner] seeking a hearing on an ineffective

assistance of counsel claim 'need establish only that he has a plausible claim of ineffective

assistance of counsel, not that he will necessarily succeed on the claim.'" Raysor v. United

States, 647 F.3d 491, 494 (2d Cir. 2011) (quoting Puglisi v. United States, 586 F.3d 209, 213

(2d Cir. 2009)). This determination is "analogous" to summary judgment proceedings: "If

material facts are in dispute, a hearing should usually be held, and relevant findings of facts

made." Id. (quoting Puglisi, 586 F.3d at 213). This threshold is lower than the required showing

for a petitioner to merit discovery. Therefore, a petitioner who fails to establish the need for an

evidentiary hearing will also not be entitled to any discovery.

## III.    THE INSTANT PETITION

Petitioner timely filed the instant Petition on February 22, 2011,[6] asserting that he "has

maintained his absolute innocence . . . at all times with respect to all charges in this case." (Pet.

Addendum ("Pet. Add'm") (Dkt. 1-1) at 1.) He asserts nine legal claims (see Pet.), and also

"requests an evidentiary hearing . . . and the opportunity to obtain the necessary discovery in

advance of such a hearing" (Pet'r Reply Mem. (Dkt. 31) at 12). In the interest of analytic

efficiency, the court groups Petitioner's claims in the following four categories:

---

[6] Habeas petitions under Section 2255 are subject to a one-year statute of limitations. 28 U.S.C. § 2255(f). In this case, the one-year period runs from "the date on which the judgment of conviction [became] final." Id. § 2255(f)(1). A conviction is considered "final" when the Supreme Court "denies a petition for a writ of certiorari." Clay v. United States, 537 U.S. 522, 527 (2003). Petitioner's certiorari petition was denied on February 22, 2010. Amato v. United States, 559 U.S. 962 (2010). The Petition was therefore timely filed on February 22, 2011.

- <u>Ineffective assistance of counsel</u>. Petitioner presents two distinct legal arguments, one based on White's alleged conflict of interest, and another based on allegations of general error. The court finds that both arguments lack merit, and further, that Petitioner has failed to meet the required showing to merit discovery or an evidentiary hearing.

- <u>Two additional claims asserted for the first time on collateral review</u>. Petitioner asserts that that the Government unlawfully withheld evidence and impermissibly relied on a "spy in the camp." The court finds that Petitioner has failed to show "cause and prejudice," and that these claims are therefore procedurally barred from habeas review.[7]

- <u>The same five claims rejected by the Second Circuit on direct appeal</u>. Petitioner argues that he is entitled to raise these claims again on habeas review as a result of White's alleged ineffectiveness. The court finds, however, that the mandate rule precludes review of these claims.

- <u>A catch-all claim</u> that Petitioner was denied his constitutional rights "by the cumulative effect" of these errors. The court finds this claim to be without merit.

The court notes that Petitioner's factual recitations and legal analysis are scattered across 12 documents[8] that collectively total over 200 pages, even before accounting for Petitioner's many exhibits. These filings frequently fail to specify which factual allegations correspond to which legal arguments, indicate where analysis of one claim ends and analysis of the next begins, or cite any supporting authority for certain conclusions of law.

The court has carefully reviewed Petitioner's numerous and voluminous filings and will discuss all claims that could be readily discerned. To the extent that Petitioner's filings could be read to raise additional factual or legal claims, the court viewed those claims either as frivolous

---

[7] Petitioner's ineffective assistance claim, too, is asserted for the first time on collateral review, but that claim is not procedurally barred for the reasons discussed above in Section II.A.

[8] In addition to the Petition itself (Dkt. 1), Petitioner has submitted: a Petition Addendum (Pet. Add'm (Dkt. 1-1)); a Declaration (Pet'r Decl. (Dkt. 8)); a Memorandum in Support of the Petition (Pet'r Mem. (Dkt. 8-1)); a Reply to the Government's Opposition (Pet'r Reply (Dkt. 29)); a Memorandum in Support of the Reply (Pet'r Reply Mem. (Dkt. 31)); a Letter Regarding a Newly Discovered Transcript (Pet'r July 4, 2013, Ltr. (Dkt. 33)); two Letters Bringing Recent Relevant Authority to the Court's Attention (Feb. 19, 2015, Ltr. re New Auth. (Dkt. 36); Apr. 19, 2015, Ltr. re New Auth. (Dkt. 37)); and a Reply to the Government's Response to Petitioner's Supplemental Submissions (Pet'r Suppl. Reply (Dkt. 43)). When the court issued a short order soliciting White's response to the issues raised in the Petition, Petitioner filed a letter opposing the order itself (Pet'r Mar. 24, 2017, Ltr. (Dkt. 45)) as well as an eight-page response to White's two-page declaration (Pet'r Resp. to White Decl. (Dkt. 47)).

because they are clearly contradicted in the trial record,[9] or as not sufficiently developed to merit the court's consideration.[10]  In deciding to pass on those baseless or untethered allegations, the court notes that Petitioner is represented by counsel, and is therefore not entitled to the solicitude accorded to pro se habeas filings.  Cf. Keeling v. Hars, 809 F.3d 43, 47 n.2 (2d Cir. 2015) (noting the court's obligation to "construe the submissions of a pro se litigant liberally and interpret them to raise the strongest arguments that they suggest." (internal quotation marks omitted)).  Moreover, Petitioner's counsel has repeatedly ignored the court's individual rules on the appropriate number and length of filings.

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's primary claim for habeas relief is that White was constitutionally ineffective "at all stages of the trial and appeal."  (Pet'r Mem. at 2.)  Petitioner asserts two legal theories: first, that White "operated at all times under an actual conflict of interest . . . arising from his [prior] representation of Joseph Massino"; and second, that White's representation was ineffective "irrespective of the conflicts."  (Pet'r Mem. at 2.)

---

[9] These attacks typically take the form of Petitioner accusing White of failing to pursue a particular strategy despite clear evidence in the record that White did, in fact, pursue that strategy.  As one example, Petitioner points to Government witness Tabbita's statement that he did not recall his prior testimony regarding Petitioner's involvement in the DiFalco murder.  (Pet'r Reply at 8-13.)  Petitioner argues that such statements "should have been sufficient for Mr. White to effectively make a case that all of Tabbita's testimony should have been  disregarded," and accuses White of "wholly fail[ing] to hit this basic and fundamentally important point."  (Id. at 12-13.)  The record shows, however, that White dedicated substantial effort to the task of impeaching Tabbita's credibility, including by highlighting specific flaws in his testimony.  (See, e.g., Tr. 3636:5-6 ("[O]f all the witnesses in this trial, [Tabbita] is by far the most untrustworthy."), 3635:11-13 ("[N]o jury could ever convict anybody of any crime based on the testimony that you heard and saw from that witness box" from Tabbita.); see generally Tr. 3635-56.)

[10] For example, Petitioner's Reply—his fifth substantive filing on collateral review—introduces wholly new allegations regarding plea negotiations.  For the first time, Petitioner alleges that White's advice regarding plea deals was constitutionally ineffective for reasons unrelated to White's conflict of interest.  (See Pet'r Reply at 22-24; compare with Pet. Add'm at 13 (mentioning plea negotiations solely in the context of Petitioner's conflict-based arguments).)  Petitioner fails to connect these novel allegations with any legal authority, except insofar as a footnote in a separate document lists four cases that generally address "ineffectiveness for failing to explain consequences in the context of plea discussions."  (Pet'r Reply Mem. at 12 n.9.)  "It is well settled [] that a court need not consider arguments relegated to footnotes or raised for the first time in a reply brief."  F.T.C. v. Tax Club, Inc., 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014) (citing Tolbert v. Queens Coll., 242 F.3d 58, 75 (2d Cir. 2001), and other cases).  The court declines to play a game of "connect the dots" involving untimely factual allegations and unelaborated string citations in separate documents.

In an effort to expand the record, the court requested a statement from White "addressing the issues raised in the Petition." (Feb. 27, 2017, Order (Dkt. 44) at 2.) White duly filed a declaration (the "White Declaration") explaining that he retired in 2011 and "no longer [has] any files . . . relating to either" Massino's or Petitioner's case. (White Decl. (Dkt. 46-1) ¶ 4.) White states that he has "no recollection" of any information learned while representing Massino, or of his strategy regarding Massino as a potential witness in Petitioner's trial. (Id. ¶¶ 5-7.) The court therefore relies on the trial record and the allegations in the Petition, recognizing that the court "need not assume the credibility of [Petitioner's] factual assertions" if they "are contradicted by the [trial] record." Broxmeyer v. United States, 661 F. App'x 744, 750 (2d Cir. 2016) (summary order) (emphasis added) (quoting Puglisi, 586 F.3d at 214).

After defining the applicable legal standards, the court considers, first, the nature of White's conflict of interest. The court finds that Petitioner has failed to establish that White's prior representation of Massino created an actual conflict of interest, and therefore finds that White operated under only a potential conflict of interest. As a result, all of Petitioner's allegations of ineffective assistance—both conflict-related and otherwise—are governed by the standard established in Strickland v. Washington, 466 U.S. 668 (1984). The court concludes that Plaintiff has failed to establish a "plausible claim" of ineffective assistance of counsel, and is therefore not entitled to an evidentiary hearing nor to habeas relief.

### A. Legal Standards

#### 1. General Ineffectiveness

"To establish that counsel's performance was constitutionally defective," a habeas petitioner must generally satisfy the "performance and prejudice" Strickland test: the petitioner bears the burden of showing that (1) "the lawyer's performance fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceedings would have been different." Torres v.

Donnelly, 554 F.3d 322, 325 (2d Cir. 2009) (citations and internal quotation marks omitted).

"In determining whether counsel's performance was objectively deficient" under the first

prong, "courts 'must indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance; that is, the petitioner must overcome the

presumption that, under the circumstances, the challenged action might be considered sound trial

strategy.'" Pizzuti v. United States, No. 02-CR-1237 (LAP) (HBP), 2014 WL 4636521, at *15

(S.D.N.Y. Sept. 16, 2014) (quoting Strickland, 466 U.S. at 689). The Supreme Court has

emphasized, however, that both prongs must be satisfied: "even if counsel's performance is

found [to be] professionally unreasonable, 'any deficiencies . . . must be prejudicial to the

defense in order to constitute ineffective assistance under the Constitution.'" Torres, 554 F.3d

at 325 (emphasis added) (quoting Strickland, 466 U.S. at 692). "When a defendant challenges a

conviction," a defendant must establish "a reasonable probability that, absent the errors, the

factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695.

    2. Conflicts of Interest

"It is well-established that 'a defendant's Sixth Amendment right to effective assistance

of counsel includes the right to representation by conflict-free counsel.'" United States v.

Cohan, 798 F.3d 84, 88 (2d Cir. 2015) (quoting LoCascio v. United States, 395 F.3d 51, 56

(2d Cir. 2005)). The court has an obligation to protect that right by "initiat[ing] an inquiry

whenever it is sufficiently apprised of even the possibility of a conflict of interest," and, if

necessary, holding a Curcio hearing for the purpose of "disqualify[ing] counsel or seek[ing] a

[conflict] waiver from the defendant." Id. (quoting United States v. Rogers, 209 F.3d 139, 143

(2d Cir. 2000)). This inquiry is often called the "Sullivan inquiry" in reference to the Supreme

Court's directive in Cuyler v. Sullivan that a trial court should investigate when it "knows or reasonably should know that a particular conflict exists." 446 U.S. 335, 347 (1980).

There is no dispute in this case that the court did not conduct a full Sullivan inquiry for Petitioner. This oversight was regrettable, as a Sullivan inquiry is the best means of protecting a defendant's right to conflict-free counsel. The Supreme Court has clarified, however, that automatic reversal is not warranted in cases such as this one. See Mickens v. Taylor, 535 U.S. 162 (2002). Rather, the court will only find that Petitioner "has suffered ineffective assistance of counsel in violation of the Sixth Amendment if his attorney" had (1) "an actual conflict of interest that adversely affected the attorney's performance," or (2) "a potential conflict of interest that resulted in prejudice." Cohan, 798 F.3d at 88 (quoting United States v. Levy, 25 F.3d 146, 152 (2d Cir. 1994)).

### a. Automatic Reversal Is Not Warranted

Generally, a trial court's failure to inquire into a potential conflict of interest on the part of defense counsel does not automatically require reversal of the conviction, even if the trial court knew or should have known about the potential conflict. Mickens, 535 U.S. at 172-73. The Mickens Court reasoned that a "trial court's awareness of a potential conflict neither renders it more likely that counsel's performance was significantly affected nor in any other way renders the verdict unreliable." Id. at 173. Automatic reversal applies only in certain limited circumstances, including the scenario contemplated in Holloway v. Arkansas:[11]

> In [Holloway], defense counsel had objected that he could not adequately represent the divergent interests of three codefendants. Without inquiry, the trial court had denied counsel's motions for the appointment of separate counsel and had refused to allow counsel to

---

[11] In addition to the Holloway scenario, automatic reversal is required if trial counsel has a per se conflict of interest because "trial counsel is not authorized to practice law, or is implicated in the very crime for which his or her client is on trial." Martinez v. Kirkpatrick, 486 F. App'x 158, 160 (2d Cir. 2012) (summary order) (quoting Armienti v. United States, 234 F.3d 820, 823 (2d Cir. 2000)). Petitioner has not alleged a per se conflict in this instance.

cross-examine any of the defendants on behalf of the other two. The Holloway Court deferred to the judgment of counsel regarding the existence of a disabling conflict . . . .

Id. at 167 (internal quotation marks omitted) (describing Holloway v. Arkansas, 435 U.S. 475, 478-80, 485-86 (1978)).

Petitioner "asserts that automatic reversal is required here" because White "did, in fact, object," and "the Court failed to conduct the required inquiry." (Pet'r Suppl. Reply at 6.) Petitioner is incorrect. Whereas the defense counsel in Holloway "protested his inability" to simultaneously represent three codefendants, Mickens, 535 U.S. at 173, White argued that "any potential conflict of interest" on his part was "clearly waivable," and that "Amato [was] prepared to make any appropriate waivers at a 'Curcio hearing'" (2d White Ltr. at 1-2). Automatic reversal is therefore not appropriate in this instance. See Mickens, 535 U.S. at 173 ("[A] defense attorney is in the best position to determine when a conflict exists," and "his declarations to the court are 'virtually made under oath.'" (quoting Holloway, 435 U.S. at 485-86)). Instead, the court must assess White's actual performance at trial. The appropriate legal standard for that assessment depends on the nature of White's conflict of interest, as discussed in the following sections. See id. at 173-74.

### b. Actual Conflicts of Interest

If a petitioner's "defense counsel was 'burdened by an actual conflict of interest,'" the petitioner is entitled to "a 'limited presumption of prejudice.'" Torres, 554 F.3d at 325 (quoting Strickland, 466 U.S. at 692)). The presumption only attaches, however, "if the defendant demonstrates that counsel actively represented conflicting interests" and that the conflict "adversely affected his lawyer's performance." Id. (quoting Strickland, 466 U.S. at 692).

An "actual conflict of interest" means "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." Mickens, 535 U.S. at 171 (emphasis in

26

original) (internal quotation marks omitted).  "An actual conflict 'adversely affects counsel's performance' if 'some plausible alternative defense strategy or tactic might have been pursued, and the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" Curshen v. United States, 596 F. App'x 14, 16 (2d Cir. 2015) (summary order) (alterations omitted) (quoting Schwarz, 283 F.3d at 92); see also Martinez v. Kirkpatrick, 486 F. App'x 158, 160 (2d Cir. 2012) (summary order) ("Actual conflicts of interest occur when the interests of the defendant and his counsel 'diverge with respect to a material factual or legal issue or to a course of action.'" (quoting Schwarz, 283 F.3d at 91)).

This standard is less demanding than the Strickland test because the petitioner need not show actual prejudice.  For the purpose of the "adverse effect" analysis, a "plausible defense strategy is a strategy that could have been pursued even if, in all likelihood, it would have failed." Curshen, 596 F. App'x at 16 (citing Schwarz, 283 F.3d at 92.)  The petitioner retains the burden of showing "causation," however.  LoCascio, 395 F.3d at 56.  "In other words, he must show that 'trial counsel chose not to undertake [the alternative strategy] because of his conflict.'"[12] Id. at 56-57 (alteration in original) (emphasis added) (quoting Winkler v. Keane, 7 F.3d 304, 309 (2d Cir. 1993)).

c.  *Potential Conflicts of Interest*

If Petitioner fails to establish that defense counsel's performance was adversely affected by an actual conflict of interest, then the court will find that White's relationships created only a potential conflict of interest.  Martinez, 486 F. App'x at 160 ("[P]otential conflicts of interest

---

[12] The court cautions that a petitioner need not necessarily establish the attorney's subjective state of mind.  See Tueros v. Greiner, 343 F.3d 587 (2d Cir. 2003) (holding that actual conflicts of interest should be defined based on objective duties rather than an attorney's subjective beliefs).  Rather, the petitioner may establish constructive causation by showing that an alternative strategy was "inherently in conflict with . . . the attorney's other loyalties or interests." Curshen, 596 F. App'x at 16 (alterations and citation omitted) (emphasis added).

arise if 'the interests of the defendant may place the attorney under inconsistent duties at some time in the future.'" (quoting United States v. Kliti, 156 F.3d 150, 153 n. 3 (2d Cir. 1998))). Unlike actual conflicts, potential conflicts impart no presumption of prejudice: to succeed on an ineffectiveness claim based on a potential conflict, Petitioner bears the burden of satisfying Strickland's "performance and prejudice" test. See Tueros v. Greiner, 343 F.3d 587, 592 (2d Cir. 2003); Pepe v. Walsh, 542 F. App'x 54, 56 (2d Cir. 2013) (summary order).

## B. The Nature of White's Conflict of Interest

Petitioner contends that White "operated at all times under an actual conflict of interest." (Pet'r Mem. at 2.) Petitioner therefore bears the burden of showing adverse effect by (1) identifying a "plausible alternative defense strategy or tactic [that] might have been pursued," and (2) showing that "the alternative defense was inherently in conflict with or not undertaken due to [White's] other loyalties or interests.'" Curshen, 596 F. App'x at 16 (citation and internal quotation marks omitted).

Petitioner argues that White's conflict adversely affected his ability to "fully and appropriately counsel" Petitioner with regard to plea negotiations, as well as "when it came time to decide whether to call Massino as a witness on the key issues in the case," or "whether to stipulate to the exclusion" of the 302 Notes. (Pet Add'm at 5 n.2, 13.) The court assumes, without deciding, that Petitioner has sufficiently alleged "plausible alternative strategies."[13]

---

[13] The court notes that Petitioner has offered scant allegations regarding plea negotiations. Petitioner has alleged only that "White was unable to fully and appropriately counsel Mr. Amato on the advisability or even the possibilities of entering into pleas negotiations in the case, other than conveying to him an offer of a term of years made to him by the government." (Pet. Add'm at 13.) Petitioner does not allege with any specificity what White could or should have done differently. (See Pet'r Reply at 22-24.) But see note 10, supra (noting that Petitioner's Reply introduces wholly new allegations of non-conflict-related ineffectiveness concerning plea negotiations, and explaining why the court declines to consider those allegations). "Although a [petitioner] need not show that the negotiation of a plea bargain would have been successful, the strategy must nevertheless 'possess[] sufficient substance to be a viable alternative.'" Eisemann, 401 F.3d at 107 (quoting United States v. Feyrer, 333 F.3d 110, 116 (2d Cir. 2003)). The court need not address this issue, however, because the court resolves Petitioner's allegations of actual conflict on other grounds.

In order to determine whether any of these strategies were "inherently in conflict" with White's duties to Massino, the court must first determine what those duties were. After identifying White's ethical obligations to his former client, the court considers whether any of those obligations were at cross-purposes with Petitioner's proposed strategies. Finding no inherent conflict, the court concludes that Petitioner has failed to plausibly establish adverse effect, and therefore, that White's prior representation of Massino created only a potential conflict of interest. Mickens, 535 U.S. at 171.

      1.  A Lawyer's Ethical Obligations to a Former Client

Courts have recognized "the high probability of prejudice arising from multiple concurrent representation," but neither the Supreme Court nor the Second Circuit has assessed whether "cases of successive representation" generally produce actual conflicts of interest. Mickens, 535 U.S. at 175-76 (emphasis added) (noting that "the Federal Rules of Criminal Procedure treat concurrent representation and prior representation differently"); see also Eisemann v. Herbert, 401 F.3d 102, 108 (2d Cir. 2005) (declining to reach the issue); Pepe, 542 F. App'x at 55 (same). "The question of whether an actual conflict existed in the context of [White's] successive representation" therefore "requires the Court to determine . . . whether Petitioner's interests were, in fact, materially adverse to those of [the former client]."[14] Medrano v. United States, No. 06-CR-61 (LTS), 2015 WL 4522857, at *5 (S.D.N.Y. July 27, 2015) (citing United States v. Feyrer, 333 F.3d 110, 116 (2d Cir. 2003)).

Petitioner contends that "White was duty[-]bound to avoid doing anything that would undermine his former client's best interests." (Pet. Add'm at 8; see also, e.g., Pet'r Suppl. Reply

---

[14] Petitioner correctly contends that the court should not defer to White's legal conclusion that the conflict was waivable, or to his factual representation that Petitioner was prepared to make any appropriate conflict waivers. (See Pet'r Reply Mem. at 8 n.6 (citing Wood v. Georgia, 450 U.S. 261, 265 n.5 (1981); Levy, 25 F.3d at 158; United States v. Iorizzo, 786 F.2d 52, 59 (2d Cir. 1986))); see also 1st White Ltr.; 2d White Ltr.)

at 13 ("White could not ethically be in a position of causing negative consequences for his [former] client Massino.").)  Petitioner cites no authority in support this expansive conception of a lawyer's duty former clients.  The New York Rules of Professional Conduct define a more modest set of specific obligations: "A lawyer who has formerly represented a client in a matter shall not," without the consent of the former client: (1) "reveal [the former client's] confidential information, or use such information to the disadvantage of the former client, except as these Rules would permit or require with respect to a current client or when the information has become generally known"; or (2) represent a new client in a "substantially related matter" if the new client's "interests are materially adverse to the interests of the former client." N.Y. Rules Prof'l Conduct r. 1.9(a), (c); see also E.D.N.Y. Local Civ. Rule 1.5(b)(5) (authorizing the court to discipline an attorney if, "[i]n connection with activities in [the Eastern District of New York], [the] attorney is found to have engaged in conduct violative of the New York State Rules of Professional Conduct").

    "[T]he Supreme Court has repeatedly held that 'breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel.'" Bethea v. Walsh, No. 09-CV-5037 (NGG), 2016 WL 258639, at *30 n.17 (E.D.N.Y. Jan. 19, 2016) (quoting Mickens, 535 U.S. at 176, and collecting cases).  In order for Petitioner to establish an actual conflict of interest, however, he must show, at a minimum, that White's ethical obligations to Massino caused a material divergence of interest with Petitioner's defense. Martinez, 486 F. App'x at 160 (citation omitted).  Therefore, the court will consider whether any of Petitioner's proposed alternative strategies would have subjected White to conflicting duties because (1) White risked revealing Massino's confidential information or using it in a manner

that would have disadvantaged Massino; or (2) Petitioner's trial was "substantially related" to Massino's trial, and Petitioner's interests were materially adverse to Massino's.

### 2. Adverse Effect

#### a. *Confidential Information*

Petitioner accurately states that White had "continuing duties to maintain" his "former client's . . . confidences[] and secrets." (Pet. Add'm at 6.) Petitioner has not, however, alleged any specific confidential information that White learned from Massino that was, or could have been, used to advance Petitioner's defense. That being said, the court recognizes the tension in expecting Petitioner to ascertain, without discovery, whether White actually learned any relevant secrets from Massino, especially if those secrets never surfaced at trial. After considering the record, however, the court finds no basis for concluding that White learned any pertinent confidential information while representing Massino.[15] White's continuing duty of confidentiality, therefore, does not provide a basis for finding an actual conflict of interest.

When White first notified the court of his conflict, he stated that he could "recall no material information or confidences and secrets conferred upon [him] by Massino" during their brief relationship. (1st White Ltr. at 3.) As a result, White did not think it necessary to seek a waiver of attorney-client privilege. (Jan. 2006 Status Conf. Tr. 39:10-13.) Although he initially intended to secure co-counsel as a precautionary measure, he was comfortable with the possibility of cross-examining Massino himself, if necessary, and indeed, he attempted to call Massino as a witness regarding Vitale's testimony.[16] See supra Sections I.B, I.C.1.a.ii.

---

[15] White's declaration states that he "[has] no recollection of the particular content" of his meetings with Massino. (White Decl. ¶ 5.) He is therefore "unable to identify information obtained from Mr. Massino that could have been used in support of Mr. Amato's defense," or to surmise as to "how any information imparted to [him] by Mr. Massino could have impacted on plea negotiations on behalf of Mr. Amato." (Id. ¶ 6.) Absent any allegations from Petitioner that White possessed specific confidential information, the court deduces what it can from the trial record.
[16] To the extent that White possessed confidential information that was not material to Petitioner's trial, he represented to the court that he "would not seek to cross-examine Massino based on any privileged communications,

The Supreme Court has "recognize[ed] that a defense attorney is in the best position to determine when a conflict exists, that he has an ethical obligation to advise the court of any problem, and that his declarations to the court are virtually made under oath." Mickens, 535 U.S. at 167-68 (citations and internal quotation marks omitted). The Second Circuit has cautioned, however, that the existence of an actual conflict should not be "determined only by the attorney's [subjective] belief." Tueros, 343 F.3d at 597 (emphasis added). A purely subjective standard would "create more injustice than it would remedy" because any attorney "who [was] blinded to his or her own conflict" would never be held to "violate his client's constitutional rights." Id.

The court once again turns to the New York Rules of Professional Conduct, which provide a standard for assessing White's representations: courts may reach a "conclusion about [a lawyer's] possession of [confidential] information" from a prior client "based on the nature of the services the lawyer provided the former client[,] and information that would in ordinary practice be learned by a lawyer providing such services." N.Y. Rules Prof'l Conduct r. 1.9 cmt. 3. Under that analysis, the court finds White's statement—that he learned "no material information or confidences"—to be consistent with the nature of his work for Massino.

White's representation was brief in duration and limited in scope. For eight months, he was one of multiple lawyers from different firms supporting Massino's primary defense counsel. His duties "consisted of making requests for discovery, making an application to facilitate meetings [at the detention center where Massino was being held], making a motion to consolidate the two indictments that were filed against Massino, and responding to the

---

unless [Massino] waived the privilege." (2d White Ltr. at 1-2.) See also Eisemann, 401 F.3d at 109 (considering the argument that a lawyer faced an actual conflict in calling his prior client as a witness based on the "risk [of] revealing confidences," but rejecting that argument because "any such problem could have been avoided by a careful direct examination," and because the prior client might have waived privilege if asked to do so).

Government's application seeking to disqualify" the "'learned counsel' [selected by] Massino on a death-eligible indictment." (1st White Ltr. at 3.) The court notes, in addition, that Massino was not charged with any activities in connection with the DiFalco or Perrino murders. (See Superseding Indictment (Dkt. 535), Massino I; Indictment (Dkt. 1), Massino II.)[17] It seems unlikely that his defense team would have conducted inquiries or sought discovery concerning those murders.

In sum, White's activities on behalf of Massino was both limited in scope and peripheral to the substantive work on Massino's defense. Legal representation of this nature, which terminated before the commencement of pre-trial motion practice, would not be expected to involve discussions of specific factual allegations pertaining to crimes for which the defendant was not charged. There is thus no reason to suspect that White possessed any pertinent confidential information, much less that he was confronted with an opportunity to use any such information to Massino's disadvantage. The court finds no evidence of actual conflict based on White's duty of confidentiality to Massino. Cf. United States v. Blount, 291 F.3d 201, 212 (2d Cir. 2002) (finding only a potential conflict where a cooperating witness had previously been represented by defense counsel's firm, and noting that the defendant "has not suggested that [defense counsel] had any information from, or with respect to, [the cooperating witness] that could have been used" for the defense).

### b. *Materially Adverse Interests*

Whether or not White possessed any relevant confidential information, he could have run afoul of his ethical duties to Massino if (1) Petitioner's trial was "substantially related" to White's prior representation of Massino, and (2) Petitioner's interests were "materially adverse"

---

[17] Each of Massino's cases involved multiple superseding indictments. The court cites here to the indictments that were operative during the period of White's representation.

to Massino's. See N.Y. Rules Prof'l Conduct r. 1.9(a). Petitioner's briefing does not explicitly address the first prong, but appears to assert three ways in which Petitioner's proposed alternative strategies pitted Massino's interests against his own: Petitioner argues that White risked compromising Massino's position as a Government cooperator, causing Massino to commit perjury, and inciting Massino to incriminate himself.[18] The court finds all three bases unpersuasive. Thus, the court need not decide whether Massino's trial and Petitioner's trial were "substantially related." Because Petitioner has not shown a material divergence of interest with respect to any alternative strategies, he has failed to plausibly establish an actual conflict.

### i.  *Compromising Massino's Position as a Cooperator*

Petitioner argues that zealous advocacy on his behalf could have harmed Massino's interests as a cooperating witness. If White had "use[d] Massino to bolster [Petitioner's] case and hurt the government's case," Massino "would risk running afoul of his handlers." (Pet. Add'm at 8; see also id. at 9 ("To put [Massino] up on the stand at all . . . clearly would have undercut whatever interest it is the government has had in keeping Massino off of the stand."); id. at 13-14 (making similar allegations regarding plea negotiations).) This argument mischaracterizes the nature of cooperation agreements. The Government clarified that, "as in all cooperation agreements, Massino was obligated only to testify truthfully without regard to the outcome of any given case. Accordingly, even if Massino would testify favorably to a given

---

[18] Petitioner asserts at least two of these three reasons with respect to each of his proposed alternative strategies. (See Pet. Add'm at 13-14 ("White was unable to fully and appropriately counsel" Petitioner regarding plea negotiations because "White never could have risked having Mr. Amato, in the course of plea discussions, . . . show the government that Massino was not credible because of crimes he had committed that he never admitted to . . . [,] things which would have inured to Massino's detriment in his relationship with the government."); id. at 11 ("White could not fully and fairly evaluate . . . whether and how to use the [302 Notes] in his cross-examination of Vitale . . . [,] nor could he fairly or effectively evaluate the advisability of calling Massino as a witness, forcing him to risk angering the government by disputing their 'proof' on [the] thinly built" DiFalco murder case, or the risk of causing Massino to "commit[] perjury by falsely disavowing the [302 Notes]."); id. at 9 ("Subjecting Massino to cross-examination [] risked the exposure of other crimes to which Massino had never admitted.").)

defendant, such testimony would not jeopardize his agreement." (Gov't Opp'n at 30.) Indeed, though the Government decided not to call Massino as a witness, they acknowledged before trial that "the defense [was], of course, free to call him."[19] (May 22, 2006, Gov't Mot. in Lim. at 6.)

The court notes, moreover, that White's representation of Massino terminated in the early pre-trial phase, long before Massino initiated discussions regarding cooperation. Petitioner's scenario is therefore quite unlike cases in which courts found actual conflicts based on concurrent representation of a defendant and a cooperator, see United States v. Daugerdas, 735 F. Supp. 2d 113, 116 (S.D.N.Y. 2010); United States v. Rodriguez, No. 99-CR-166 (NG), 1999 WL 314162, at *2-3 (E.D.N.Y. May 18, 1999), or successive representation in which the lawyer facilitated the prior client's cooperation against the current client, see United States v. Dipietro, No. 02-CR-1237 (SWK), 2004 WL 613073, at *3-4 (S.D.N.Y. Mar. 29, 2004), aff'd sub nom. United States v. Genua, 274 F. App'x 53 (2d Cir. 2008) (summary order).

ii.    *Causing Massino to Commit Perjury*

Petitioner next argues that Massino's interests were adverse to Petitioner's based on the risk that Massino might "falsely den[y]" an earlier statement, thereby subjecting himself "to a perjury charge." (Pet. Add'm at 8-9.) Petitioner focuses entirely on Massino's statements in 302 Notes, however, which consist of handwritten marginalia on a document reviewed during his own trial preparation, which Massino later turned over to the Government after becoming a cooperator. Petitioner has not identified any relevant statements made under penalty of perjury. Any risk that White may have prompted perjury on Massino's part is thus purely speculative "and fails for lack of any support in the evidence." Eisemann, 401 F.3d at 109.

---

[19] The Government opposed White's motion to call Massino for a limited evidentiary hearing regarding the basis of his knowledge of the DiFalco murder, as discussed above in Section I.C.1.a.ii. That opposition, however, was distinct from the issue of Massino's general availability as a witness for the defense.

In any event, Petitioner himself points out the overarching flaw in this argument by acknowledging that White "had an obligation to expose Massino as a liar if Massino did not tell the truth" on the stand. (Pet. Suppl. Reply at 13.) The Second Circuit has explicitly clarified "that the tension between [the] parallel duties of (1) zealous representation and (2) candor to the court . . . [does] not create [an actual] conflict of interest." Torres, 554 F.3d at 326. "[D]efense counsel's ethical obligation to correct [] testimony he [knows] to be inaccurate"—irrespective of whether that testimony comes from an adverse witness or his own client, or whether the correction benefits the defense or the prosecution—merely reflects the "ethical guidelines applicable to every attorney appearing as trial counsel." Id. If there is no actual conflict when an attorney actually corrects perjured testimony on the stand, then Petitioner cannot plausibly argue that an actual conflict existed based on the risk that White might have had to correct perjured testimony, had Massino actually taken the stand and committed perjury.

### iii.    *Exposing Other Crimes*

Finally, Petitioner argues that "subjecting Massino to cross-examination [] risked the exposure of other crimes to which Massino had never admitted," possibly including criminal "conduct following his . . . decision to 'cooperate.'" (Pet. Add'm at 9; see also id. at 13-14 (making similar allegations regarding plea negotiations).) This argument founders on two grounds. First, Petitioner has not alleged that either he or White actually knew of such crimes and was willing to expose them in court or during plea negotiations. This theory, like the perjury theory, "rests on speculation . . . , and fails for lack of any support in the evidence."[20] Eisemann,

---

[20] The court notes that Massino had already been found guilty on illegal gambling charges that substantially resembled Petitioner's charges, so there was no risk of novel exposure on those activities. (Compare Superseding Indictment (Dkt. 665) & Jury Verdict (Dkt. 806), Massino I, with Pet'r Superseding Indictment (Trial Dkt. 4).) In addition, Petitioner does not allege that Massino was involved in the DiFalco or Perrino murders. Therefore, any additional criminal activity could only have come to light through general efforts to impeach Massino, a task for which ample ammunition already existed in the public record of his convictions and guilty pleas. Petitioner

401 F.3d at 109.  Second, even if Petitioner had presented specific allegations, Massino "would

have had the protection of the privilege against self-incrimination, and nothing in the record

suggests that he was willing to waive his privilege."  Id.

### c.  Summary: No Adverse Effect

The court finds that Petitioner has failed to plausibly establish that White operated under

an actual conflict of interest.  Petitioner asserts in the strongest terms that White should have

acted differently, but fails to establish that any of his suggested alternative strategies were

"inherently in conflict" with any of White's duties to Massino as a former client.  Curshen,

596 F. App'x at 16 (citation and internal quotation marks omitted).  Petitioner has therefore

failed to establish adverse effect because he has not shown the requisite "causation."  LoCascio,

395 F.3d at 56; see also Mickens, 535 U.S. at 171 (An "actual conflict of interest" means "a

conflict that affected counsel's performance—as opposed to a mere theoretical division of

loyalties." (internal quotation marks omitted)); Guadmuz v. LaValley, No. 10-CV-4408 (ARR),

2012 WL 1339517, at *7 (E.D.N.Y. Apr. 17, 2012) ("Petitioner's speculation that [counsel]

changed his planned trial strategy because of an alleged allegiance to [a former client] is based

on nothing more than speculation, and petitioner has failed to prove that counsel's non-pursuit of

the alterative defense strategy was 'forgone as a consequence of [counsel's] alleged conflict of

interest.'" (alterations omitted) (emphasis added) (quoting Eisemann, 401 F.3d at 108)).

Moreover, Petitioner ignores certain actions that White did, in fact, take with regard to

Massino and the 302 Notes.  Although White did not call Massino as a defense witness, White

did seek to call him for a limited evidentiary hearing on the precise subject of Massino's

comments to Vitale regarding Petitioner's role in the DiFalco murder.  See supra

---

references the possible existence of "money [that] Massino had out on the street and was collecting" (Pet. Add'm at 13-14), but the court declines to give weight to vague speculation of that nature.

Section I.C.1.a.ii. Although White did not introduce the 302 Notes at trial, he did notify the court that he might seek to introduce them if Massino were called to testify, or if Massino's statements to Vitale were admitted as co-conspirator statements. See supra Section I.C.1.a.i. White's actions suggest that he did not view these tactics as ethically foreclosed, even if the tactics were ultimately blocked by court rulings or abandoned for strategic reasons.

Petitioner may disagree about whether White's decisions were wise, but any such discussion speaks to the Strickland test for ineffectiveness, as discussed below. For the purpose of establishing an actual conflict of interest, the merits of an alternative strategy are relevant only insofar as the strategy must be "plausible." Because the court assumed plausibility in this instance, Petitioner's burden was to show that a path not taken was inherently in conflict with White's duties to Massino. This Petitioner has failed to do. He has not identified any plausible strategies that were precluded by White's legitimate ethical obligations to his former client.

3. Conclusion: White Operated Under a Potential Conflict of Interest

Because Petitioner has not shown a material divergence of interest between White's duties to Massino and to Petitioner, the court finds that White's prior representation of Massino created a potential—rather than an actual—conflict of interest at Petitioner's trial. As a result, the Strickland test governs all of Petitioner's claims of ineffective assistance of counsel, whether related to White's potential conflict or not. Tueros, 343 F.3d at 592; Pepe, 542 F. App'x at 56. Therefore, in the interest of clarity, the court will analyze Petitioner's conflict- and non-conflict-based claims together, grouped by the relevant criminal charge or phase of the trial.

**C. Allegations Pertaining to the DiFalco Murder**

Petitioner appears to challenge four distinct areas of White's defense strategy with regard to the DiFalco murder charge. Petitioner argues that White should have: (1) called Massino as a witness to discuss the 302 Notes; (2) further investigated Bonanno associate Fabio Bartolotta's

possible motive for killing DiFalco; (3) adduced additional evidence regarding Petitioner's

financial relationship with the Giannini restaurant; and (4) more vigorously challenged the

Government's allegations that Petitioner acted suspiciously following DiFalco's disappearance.

For each set of allegations, the court finds that Petitioner has failed to make a plausible showing

with regard to one or both prongs of Strickland's "performance and prejudice" test.

    1.  Massino as a Potential Witness

Petitioner argues that the 302 Notes were a "vitally important document" that "directly

undercut Vitale's claim on the central issue of the case," and that there "is no reasonable

strategy-related reason" why the 302 Notes were not "used by the defense." (Pet. Add'm at 11.)

"Massino was fully available as a witness to be examined about [the 302 Notes]," and Petitioner

contends that, had he been called to testify, "he would have put the lie to Vitale's testimony

implicating" Petitioner in the DiFalco murder.[21] (Id.; Pet'r Reply Mem. at 10.) This argument

fails under the first Strickland prong because Petitioner has failed to show that White's

performance was objectively deficient.[22]

As a preliminary matter, the Second Circuit has consistently held that an attorney's

"decision 'whether to call specific witnesses—even ones that might offer exculpatory

evidence—is ordinarily not viewed as a lapse in professional representation.'" Pierre v. Ercole,

560 F. App'x 81, 82 (2d Cir. 2014) (summary order) (quoting United States v. Best,

---

[21] Petitioner does not appear to argue that White committed independent error by not seeking to use the 302 Notes even without calling Massino as a witness. His arguments all appear to rest on the premise that Massino could and should have been called to testify. (See, e.g., Pet. Add'm at 11 (arguing that White should "have been used by the defense" and noting that "Massino was fully available as a witness to be examined about" the 302 Notes).)

[22] In addition to the arguments discussed in the text, Petitioner asserts that White should have "argue[d] further and more effectively against allowing Vitale to testify at all, given the [302 Notes] directly contradicting [his testimony] and Massino's availability." (Pet. Add'm at 11.) Without further detail as to specific strategies that White should have pursued or further explanation as to any errors that White allegedly made, the court finds this claim insufficiently developed to merit the court's consideration. See supra Section I.C.1.a (discussing White's efforts to preclude or impeach Vitale's testimony); cf. Triana, 205 F.3d at 40 (habeas petitioners bear the burden of proof).

219 F.3d 192, 201 (2d Cir. 2000)); see also Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) ("The decision not to call a particular witness is typically a question of trial strategy that reviewing courts are ill-suited to second-guess." (alteration omitted) (quoting United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam))).

"[D]eference is particularly apt where, as here, an attorney decides not to call an unfriendly witness to the stand and has precious little means of determining how the witness might testify." Greiner, 417 F.3d at 323 (footnote omitted). Petitioner points to the 302 Notes and asserts that Massino was "certain [Petitioner] did not have anything to do with the Difalco murder." (Pet Add'm at 12.) In later filings, however, Petitioner acknowledges that, given "the lack of any Brady disclosure on this subject," it is eminently possible that "Massino told the government that the [302 Notes] were fabricated."[23] (Pet'r Suppl. Reply at 12; see also May 26, 2006, Amato Brady Mot. (specifically requesting "any information, whether reduced to writing or not, reflecting any inconsistency" between the 302 Notes and Vitale's testimony about Massino's alleged statements).)

The court finds that White's decision not to call Massino as a defense witness was not objectively unreasonable. Calling Massino to testify would have exposed Petitioner to the risk that Massino might actually corroborate Vitale's testimony. Instead, White opted to vigorously attack the credibility of all cooperating witnesses, especially those who (like Vitale) testified without direct knowledge, or who (like Massino) did not testify at all.[24] See supra Section I.C.1.

---

[23] The Government alleges in its opposition papers that Massino admitted to making "many false and inaccurate notes on the Vitale 302s in preparation for his 2004 trial." (Gov't Opp'n at 29.) Petitioner responds, however, that the court should not rely on the Government's unsworn allegations. (Pet'r Reply Mem. at 7 n.5.)

[24] The court relies primarily on White's conduct at trial as documented in the record, but notes that the court's characterization receives indirect support from the White Declaration. Though White is unable, at this time, to recall the contemporaneous reasoning behind his decisions at trial (see White Decl. ¶¶ 5-7), he opines on what his trial strategy would presumably have been, and offers an account consistent with the court's summary above: "I [cannot] articulate how I would have responded to any inculpatory statement made by Mr. Massino, other than, I imagine, seeking to challenge its reliability, veracity and consistency. . . . I do not recall a specific reason

Both of Petitioner's codefendants similarly chose not to call Massino as a witness, even though testimony regarding Massino's statements and conduct played a role in all three cases.

The court notes, in closing, that White did, in fact, attempt to call Massino as a witness regarding Vitale's testimony, albeit at a limited evidentiary hearing, and albeit unsuccessfully. See supra Section I.C.1.a.  Courts have rejected allegations of ineffectiveness when counsel attempted to pursue the suggested strategy, even if counsel was ultimately unsuccessful. See, e.g., United States v. Sessa, No. 92-CR-351 (ARR), 2011 WL 256330, at *51 (E.D.N.Y. Jan. 25, 2011), aff'd, 711 F.3d 316 (2d Cir. 2013) ("[P]etitioner cannot show his counsel was ineffective for failing to object to the charge where the record establishes that his objection was carefully considered by the trial court."); Rosario-Dominguez v. United States, 353 F. Supp. 2d 500, 515 (S.D.N.Y. 2005) (rejecting a claim of ineffectiveness based on a failure to challenge the court's calculation of drug quantity "because the record demonstrates that" counsel "did argue—albeit unsuccessfully—that the evidence did not support" the court's calculation).

## 2. Evidence Concerning Fabio Bartolotta

Petitioner argues that White should have dedicated additional efforts to painting Bonanno member Fabio Bartolotta as an alternative suspect for the DiFalco murder.  Bartolotta may have had a motive to kill DiFalco because Bartolotta had previously been romantically involved with DiFalco's daughter and was jealous about her new relationships, and perhaps also because Bartolotta's mother had been DiFalco's lover before he began seeing Cathy Ventimiglia. (Pet'r Decl. at 4, 18-23.)  Petitioner accuses White of "a wholesale failure . . . to investigate or pursue evidence of Bartolotta's multiple motives for killing Difalco, as well evidence that he in fact killed him," and argues that White should have pursued these theories by calling additional

---

underlying any decision not to seek to call Mr. Massino as a defense witness, other than, I imagine, maintaining focus on the reliability, veracity and consistency of the prosecution witnesses." (Id. ¶¶ 6-7.)

witnesses including Bartolotta himself, Bartolotta's mother, the man who dated DiFalco's daughter after Bartolotta, and other Bonanno members. (Pet. Add'm at 35; Pet'r Decl. at 21-22.)

Petitioner's accusation is flatly belied by the record. During the Government's summation at trial, they noted White's efforts to construct a narrative "that Fabio Bartolotta was the real killer," and that he "killed Sammy DiFalco because Fabio Bartolotta was angry about the fact that Fabio and Sammy's daughter, Francesca, had stopped dating." (Tr. 3553:25-3554:3.) The Government enumerated the many factual flaws with this theory, highlighting evidence that Bartolotta and Francesca DiFalco stopped dating two years before the murder, that DiFalco supported their relationship, and that Bartolotta viewed DiFalco "as a father figure." (Tr. 3554:3-3556:11.) Petitioner has suggested additional witnesses, but has not explained whether or how their expected testimony would have addressed those flaws.

At a higher level of generality, Petitioner dwells on arguments about Bartolotta's possible motive and criminal history, but fails to explain how those elements would exonerate Petitioner as the alleged orchestrator of the conspiracy. Even if Petitioner is correct that Tabbita asked one Bonanno associate to assist with the DiFalco murder "as a favor to Bartolotta" (Pet'r Decl. at 39), and even if it is true that Bartolotta himself committed the murderous act, those facts would not necessarily undermine the Government's theory that Petitioner issued the original order for DiFalco to be killed. See supra Section I.C.1.

To prove that White's conduct was objectively unreasonable, Petitioner would have to overcome clear precedent establishing a generally deferential posture toward strategic decisions about specific witnesses. See Greiner, 417 F.3d at 323; Pierre, 560 F. App'x at 82. To show prejudice, Petitioner would have to explain how his proposed cumulative testimony would

address the clear limitations of this "alternative suspect" defense theory. The court finds that Petitioner has failed to make a plausible showing on either prong of the Strickland test.

### 3. Petitioner's Relationship with the Giannini Restaurant

Petitioner contends that White failed to adequately challenge the Government's theory that Petitioner was effectively a partial owner of the Giannini restaurant, and that DiFalco served as a front man. (Pet. Add'm at 34.) Specifically, Petitioner argues that White should have (1) investigated "a list of the investors in the restaurant" to "arrange for their testimony concerning their exclusive ownership of the restaurant"; and (2) elicited testimony that Petitioner "regularly worked at the Giannini Restaurant." (Id. at 33-34; see also id. at 29-31.) This argument is premised on a misunderstanding of the Government's theory. Neither of Petitioner's suggested tactics would have undermined the Government's key claims.

At trial, multiple Bonanno members testified that Petitioner "owned" or "controlled" the Giannini restaurant. (See, e.g., Tr. 1068:12-13 (Tabbita); 1832:19-20 (Lino).) Vitale elaborated that Petitioner and DiFalco were "partners," and that "they were getting 50-50 . . . [o]f whatever the business threw off, whatever the profits of the business were."[25] (Tr. 383:3-5.) These accounts were consistent with testimony from Special Investigator John Carillo, who explained that the Bonanno family considered a business to be "controlled" by one of its members if the business owner paid for protection against organized criminal activity, or if the Bonanno member directly financed the business or otherwise profited from it. (Tr. 260:25-261:19, 266:15-267:5.) Carillo further explained that a "front man is the person" who owns the establishment "on paper," even if there are "illegal monies invested in that business somehow." (Tr. 261:13-16.)

---

[25] This testimony supported the Government's theory that Petitioner's motive for ordering DiFalco's murder concerned a dispute about finances at the Giannini restaurant. (See Tr. 389:11-20 (Vitale testimony); Tr. 1087:21-23 (Tabbita testimony).) See also supra Section I.C.1.

The Bonanno member who controls the location is not necessarily listed as an owner on any public records. (Tr. 267:2-5.)

It is therefore immaterial whether, as Petitioner claims, "legitimate businessmen [] had invested in" the restaurant, or even whether those investors considered themselves to be the "exclusive owners of the restaurant" in a legal sense. (Pet. Add'm at 34.) It is also immaterial whether Petitioner regularly worked at the restaurant, received a paycheck, or was listed as an employee in the restaurant's records. Above-board investment and employment relationships are not mutually exclusive with under-the-table control relationships. The court finds that Petitioner has failed to show either objectively unreasonable conduct or prejudice regarding White's decision not to present additional testimony from Giannini's investors and employees.

    4.   The Government's Allegations of Suspicious Conduct

The Government bolstered their case against Petitioner for the DiFalco murder with four types of circumstantial evidence concerning Petitioner's behavior in the weeks following DiFalco's disappearance. See supra Section I.C.1.c. Petitioner argues that White should have done more to refute two of these theories: the "false alibi" theory, and the theory that Petitioner attempted to divert suspicion to Cathy Ventimiglia. The court finds, however, that Petitioner's challenges fail to satisfy either prong of the Strickland standard, largely because both arguments focus on extraneous details that were not material to the question of Petitioner's guilt.

    a.   The "False Alibi" Theory

The Government accused Petitioner of attempting to create a false alibi by telling detectives that he was at the Giannini restaurant on the day of DiFalco's disappearance. See supra Section I.C.1.c.ii. At trial, Giannini employee Annunziati testified that he did not remember Petitioner being present on that day. Petitioner faults White for not adducing evidence to confirm Petitioner's presence at the restaurant. Petitioner alleges, for example, that if White

44

"had interviewed Annunziati before the trial, Annunziati would have told Mr. White that [Petitioner] did, indeed, work at the Giannini Restaurant and that he was at work on the day Difalco went missing." (Pet. Add'm at 32.) Petitioner further alleges that White could have elicited similar testimony from Giannini waiter Jairo Gomez and from Cathy Ventimiglia, had they been called as witnesses. (Id. at 31; Pet'r Decl. at 14.) "This theory," however, "rests on speculation as to how [these individuals] would have testified, and fails for lack of any support in the evidence."[26] Eisemann, 401 F.3d at 109. Petitioner submitted sworn statements from both Giannini employees, but neither statement addresses Petitioner's presence on the date of DiFalco's disappearance. (See Ex. 15, Pet'r Reply (Dkt. 29-15).)

Even if Petitioner is correct as to how these witnesses might have testified, the issue of Petitioner's whereabouts on February 27, 1992, is tangential to the central question of Petitioner's guilt. Petitioner was accused of ordering DiFalco's murder, not necessarily of participating physically in the lethal act. The Government accused Petitioner of lying to police investigators about his location on the night of DiFalco's disappearance—and also about Petitioner's involvement in organized crime—as one of several instances of allegedly suspicious conduct supporting his general involvement in the murder. (Tr. 3538:18-3540:18 (Gov't summation).) Moreover, with regard to Strickland's prejudice prong, White countered the Government's accusations by arguing that certain witnesses had simply misremembered details from long-ago dates, and that Petitioner would not have lied to police investigators about such an easily verifiable fact. (Tr. 3670:22-3671:16 (White summation).)

Petitioner has not made a plausible showing that White's response to this minor piece of circumstantial evidence was either objectively unreasonable or prejudicial, particularly in light of

---

[26] The Government goes a step further, contending that this argument "amounts to baseless and unwarranted accusations that the government's witnesses were lying." (Gov't Opp'n at 42 (footnote omitted).)

the Second Circuit's instruction that decisions about calling specific witnesses are "ordinarily not viewed as a lapse in professional representation." Pierre, 560 F. App'x at 82 (quoting Best, 219 F.3d at 201).

> b. *Ventimiglia as an Alternative Suspect*

The Government argued that Petitioner attempted to divert suspicion away from himself by pointing the attention of Bonanno members and police investigators toward DiFalco's lover, Cathy Ventimiglia. Petitioner argues that White should have made greater efforts to "corroborate[] Mr. Amato's statement to Detective Vormittag that on the night of" DiFalco's disappearance, "Difalco had a date with Cathy Ventimiglia, his mistress." (Pet. Add'm at 33.) In Petitioner's eyes, White should have (1) "subpoenaed Cathy Ventimiglia" after she "refused to talk to [White's] investigator,"[27] (id. at 28); and (2) interviewed "Tarik Abbas, the owner of a flower shop," who "could have testified that on . . . the day Difalco disappeared, Difalco bought flowers . . . to be delivered that day to Cathy Ventimiglia," (id. at 33).

Here, as above, Petitioner challenges a type of decision that is generally committed to trial counsel's discretion. See Greiner, 417 F.3d at 323; Pierre, 560 F. App'x at 82; see also Greiner, 417 F.3d at 321 ("[W]hen there is 'reason to believe that pursuing certain investigations would be fruitless . . . , counsel's failure to pursue those investigations may not later be challenged as unreasonable.'" (quoting Strickland, 466 U.S. at 691)); Pepe, 542 F. App'x at 56 ("Whether correct or not, the decision not to subpoena [a witness who may or may not have been helpful] cannot be labeled objectively unreasonable." (citing Luciano, 158 F.3d at 660)).

---

[27] Petitioner alleges that Ventimiglia's lawyer met with Petitioner's defense team on June 8, 2006. (Pet. Add'm at 28.) Petitioner has submitted handwritten notes, allegedly taken by White during that meeting, stating that "CV was supposed to meet Sam the night he disappeared." (Ex. 3, Ltr. with Selected Exhibits (Dkt. 34-4).)

Moreover, Petitioner misconstrues the Government's theory. "[I]t was irrelevant whether DiFalco [actually] had plans to meet Ventimiglia the night he disappeared . . . . Rather, the relevant issue was that [Petitioner's] statements to [Detective] Vormittag [and others] demonstrated his desire to deflect attention away from himself and blame the affair for DiFalco's disappearance." (Gov't Opp'n at 40.) Petitioner has failed to explain how either of his proposed witnesses would have undermined this theory, or why his proposed strategy was inherently superior to White's chosen approach of construing Petitioner's comments as genuine attempts to be helpful in the investigation (see Tr. 3667:10-22). The court sees no plausible basis for finding that White's conduct was objectively unreasonable or prejudicial.

### D. Allegations Pertaining to the Perrino Murder

Petitioner lodges two challenges to White's defense regarding the Perrino murder charge: White failed to successfully introduce extrinsic evidence of Vitale's prior inconsistent statements, and declined to elicit evidence of Vitale's involvement in crimes beyond those discussed at trial. The court finds that neither accusation plausibly establishes a constitutional violation.

#### 1. The Precluded Witnesses

Shortly after Vitale testified at trial, White sought to call three witnesses[28] for the limited purpose of eliciting extrinsic evidence of Vitale's prior inconsistent statements regarding the Perrino murder. (See June 25, 2006, Amato Mot. to Limit Cross-Ex. (Trial Dkt. 797).) The court granted the Government's motion to preclude the three witnesses based, in part, on a finding that White's cross-examination neither "afford[ed] Vitale with sufficient opportunity to explain or deny the alleged prior inconsistent statements," nor "put this court or the Government

---

[28] The three potential witnesses were Richard Cantarella, Frank Coppa, and James Tartaglione.

on notice" of White's intention to introduce extrinsic evidence  (June 27, 2006, Mem. & Order

(Trial Dkt. 807) at 12.)  Petitioner argues that White was constitutionally ineffective because he

failed "to lay a sufficient foundation for the introduction of [the] prior inconsistent statements."[29]

(Pet. Add'm at 16.)

"[W]hile in some instances 'even an isolated error' can support an ineffective-assistance

claim if it is 'sufficiently egregious and prejudicial,' it is difficult to establish ineffective

assistance when counsel's overall performance indicates active and capable advocacy."

Harrington v. Richter, 562 U.S. 86, 111 (2011) (quoting Murray v. Carrier, 477 U.S. 478, 496

(1986)).  The court finds that White's conduct with regard to the three precluded witnesses was

not "sufficiently egregious and prejudicial" to outweigh his vigorous efforts to impeach Vitale,

especially in light of the court's conclusion that Petitioner has failed to successfully allege any

other instances of constitutionally ineffective assistance.

With regard to the severity of White's error, Petitioner argues that the court "made it

abundantly clear . . . that the fault for not being able to put on these critically important

witnesses[] lay squarely with Mr. White."  (Pet. Add'm 16.)  Petitioner is correct that the court

found White's cross-examination insufficient for the purpose of giving Vitale an opportunity

respond or of providing notice to the Government and the court.  (June 27, 2006, Mem. & Order

at 9-12.)  The court acknowledged that it was a "close[] question," however (id. at 9), and

expressed "sympath[y]" for White's explanation that he had expected the Government to call the

three relevant witnesses "in its case-in-chief" (id. at 12).  It thus appears that White's error was

---

[29] On direct appeal, the Second Circuit summarily affirmed this and other evidentiary rulings, finding "no abuse of discretion or denial of due process." Amato, 306 F. App'x at 634.  Separate sections of this opinion address Petitioner's allegations of ineffective appellate counsel, as well as Petitioner's attempt to relitigate claims already resolved on direct appeal. See infra Parts V, VI.  This section considers only Petitioner's argument that White was constitutionally ineffective in his conduct at trial regarding the three potential witnesses.

likely made in good faith. Additionally, the error was not the sole basis for the court's ruling: the court found that "allowing [Petitioner] to call these witnesses would substantially burden the Government and sacrifice the orderly conduct of this trial." (Id. at 13-14.)

The court now turns to the question of prejudice. Petitioner specifies that his "defense theory" with regard to the Perrino murder is that Vitale "ordered and directly participated in the Perrino murder for his own agenda. Specifically, Vitale ordered the Perrino murder because of his concern that Perrino would disclose [Vitale's] and his son's connection with Perrino." (Pet. Add'm 14-15.) White advanced this very theory at trial, however. See supra Section I.C.2.a. Thus, the additional witnesses would have been merely cumulative. Moreover, as the trial court noted, the statements White sought to elicit from the three precluded witnesses "primarily implicate[d] the collateral matters of Vitale's role, motive and interest in ordering Perrino's death."[30] (June 27, 2006, Mem. & Order at 13 (emphasis added).) Little of the proffered testimony addressed the dispositive question of Petitioner's role as the alleged shooter. (See Pet. Add'm at 19-21 (describing Vitale's personal interest in having Perrino killed and his effort to establish an alibi for the night of the murder).)

To the extent that Petitioner expected one or more witnesses to testify that Vitale himself was the shooter, that anticipated testimony was based entirely on hearsay. (Id. at 21-22.) Petitioner does not allege that any of the three witnesses had any direct knowledge of Vitale's or Petitioner's role—or lack thereof—in the Perrino murder, nor that any of the three witnesses

---

[30] At some points, Petitioner appears to argue that Vitale's personal motivations for wanting Perrino killed precluded the murder from consideration as a Bonanno-related crime under Petitioner's RICO charge. (See, e.g., Pet. Add'm at 18 n.8 (arguing that "Vitale's personal agenda in ordering Perrino killed should have been adduced at trial . . . for a legal defense to the crime charged[,] which required the government to prove that the murder was committed in connection with the business of the racketeering enterprise").) Petitioner cites no legal authority in support of this theory. Moreover, Petitioner has failed to explain how Vitale's personal stake in the Perrino murder was inherently separate from—much less inconsistent with—the Bonanno family's interests. Vitale's personal concerns with Perrino related to his and his son's criminal activities in connection with Perrino's work at the New York Post, which was known to be a component of the overall Bonanno criminal enterprise.

would have impeached Ambrosino's testimony corroborating Petitioner's involvement. The court finds that Petitioner has failed to plausibly show "a reasonable probability that," had the additional testimony been offered, the jury "would have had a reasonable doubt respecting guilt," Strickland, 466 U.S. at 695, especially in light of the discussion below regarding cumulative impeachment evidence.

### 2. Additional Impeachment Evidence

Petitioner faults White for not investigating Vitale's potential role in two murders beyond those to which he had already confessed. (See Pet. Add'm at 23 (criticizing White for not "following up on testimony attributing to Vitale a role in the [] murder" of Louis Tuzzio); id. at 24 (Petitioner "has reason to believe that Vitale also was responsible for the murder of Willie Boy Johnson.").) Even if Petitioner is correct that Vitale was involved in both murders, however, he fails to show constitutional error based on White's decision to pursue an alternative tack. White took every opportunity to remind the jury of Vitale's confessed participation in eleven other murders. (See, e.g., Tr. 3696:9-14, 3698:20, 3703:1-6, 3704:23-24, 3705:3-5.) Moreover, "counsel for all three [Urso I] defendants spent significant portions of their cross-examination discrediting Vitale." (Gov't Opp'n at 32; see also id. at 31-32 (citing to various examples in the trial transcript).)

"Counsel's performance cannot be deemed objectively unreasonable because he failed to pursue cumulative impeachment." Love v. McCray, 165 F. App'x 48, 50 (2d Cir. 2006) (summary order) (citing United States v. Stewart, 433 F.3d 273, 315 (2d Cir. 2006); United States v. Wong, 78 F.3d 73, 82 (2d Cir. 1996)). This is particularly true where, as here, White offered a strategic reason for declining to focus on the additional murders. (See, e.g., Pet'r Decl. at 36 ("White told me that he want[ed] to leave the Tuzzio murder out of his strategy" because he planned to paint a picture of Vitale's involvement in "the Perrino murder . . . in a different color

50

[than] Vitale's involvement in the Tuzzio murder.").) Moreover, Petitioner has not shown that the cumulative impeachment would have changed the outcome of the trial. The court finds that Petitioner has failed to plausibly satisfy either Strickland prong.

### E. Petitioner's Direct Appeal

Petitioner asserts that his "claims of ineffectiveness also include post-trial and appellate representation." (Pet. Add'm at 3.) "[A] petitioner may establish constitutionally inadequate performance of appellate counsel if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Lynch v. Dolce, 789 F.3d 303, 311 (2d Cir. 2015) (alterations omitted) (quoting Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)). Petitioner does not appear to plead any relevant facts under this standard. Petitioner claims only that each "issue he raised on direct appeal must be considered anew here because counsel's representation on appeal was tainted by the conflict of interests and otherwise was ineffective in the presentation of the issues." (Pet. Add'm at 3.) The court considers those arguments below in Part VI's discussion of the mandate rule, and finds that Petitioner has failed to properly allege ineffective assistance of appellate counsel.

### F. Petitioner's Requests for Discovery and an Evidentiary Hearing

Petitioner has requested discovery and an evidentiary hearing. (Pet'r Reply Mem. at 12.) The court finds that Petitioner has failed to establish the "plausible claim of ineffective assistance of counsel" necessary to justify an evidentiary hearing, and therefore denies both requests. Raysor, 647 F.3d at 494 (citation omitted); Section II.B, supra (noting that the standard for discovery is stricter than the standard for a hearing).

"A district court may rely on its own familiarity with the case and deny [a federal habeas petition] without a hearing if the court concludes that the [petition] lacks 'meritorious allegations that can be established by competent evidence.'" Stokes v. United States, No. 00-CV-1867

51

(SAS), 2001 WL 29997, at *2 (S.D.N.Y. Jan. 9, 2001) (quoting <u>United States v. Aiello</u>,

900 F.2d 528, 534 (2d Cir. 1990)); 28 U.S.C. § 2255(b) (a court need not hold an evidentiary

hearing if "the motion and the files and records of the case conclusively show that the prisoner is

entitled to no relief"); <u>see also</u> <u>McLean v. United States</u>, No. 08-CR-789 (RJS),

2016 WL 3910664, at *8 (S.D.N.Y. July 13, 2016) (A "hearing is not required 'where the

allegations are insufficient in law, undisputed, immaterial, vague, palpably false or patently

frivolous.'" (quoting <u>United States v. Malcolm</u>, 432 F.2d 809, 812 (2d Cir. 1970))).

The court notes, preliminarily, that Petitioner has not enumerated a list of "specific facts"

to be adjudicated. <u>LoCascio</u>, 395 F.3d at 57. Rather, he requests a hearing "on all issues" raised

in the Petition (Pet'r Reply at 2), essentially seeking a full retrial on collateral review.

Petitioner's lack of specificity hinders the court's efforts to identify whether any "material facts

are in dispute." <u>Raysor</u>, 647 F.3d at 494 (citation omitted); <u>see, e.g.</u>, <u>LoCascio</u>, 395 F.3d

at 57-58 (ordering a hearing on the issue of whether, as specifically alleged in an affidavit,

defense counsel received a death threat from the petitioner's codefendant); <u>Sessa</u>, 2011 WL

256330, at *57 (noting that the petitioner "provided a list of twenty-six facts that he wishes to

prove at a hearing").

More fatal to Petitioner's request is his failure to offer "<u>meritorious allegations</u> that can

be established by <u>competent evidence</u>." <u>Stokes</u>, 2001 WL 29997, at *2 (emphasis added)

(quoting <u>Aiello</u>, 900 F.2d at 534). "In determining [whether a hearing is required, courts] look

'primarily to the . . . evidence proffered in support of the application in order to determine

whether, if the evidence should be offered at a hearing, it would be admissible proof entitling the

petitioner to relief.'" <u>LoCascio</u>, 395 F.3d at 57 (quoting <u>Dalli v. United States</u>, 491 F.2d 758,

760 (2d Cir. 1974)).

Petitioner has submitted or alluded to certain pieces of competent evidence, but only in support of facially unpersuasive arguments—for example, evidence that the Giannini restaurant had legitimate investors, a fact that would not disprove the Government's allegations of Petitioner's "control" relationship.  Such arguments, even if fully substantiated at an evidentiary hearing, would not entitle Petitioner to habeas relief.  See, e.g., Broxmeyer, 661 F. App'x at 750 (affirming denial of a hearing to investigate alleged off-the-record conversations because "the substance of those conversations [was] irrelevant" to the legal merits).

Meanwhile, Petitioner's more serious allegations—especially those concerning White's ethical obligations to Massino—find no factual support in Petitioner's habeas filings or in the underlying trial record.  These claims rest on an intangible foundation of conjecture.  Such "[a]iry generalities, conclusory assertions and hearsay statements will not suffice."  Haouari v. United States, 510 F.3d 350, 354 (2d Cir. 2007) (emphasis added) (alterations omitted) (quoting United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987)); see also, e.g., Broxmeyer, 661 F. App'x at 750 (affirming denial of a hearing regarding counsel's alleged intoxication because the petitioner "presented no plausible reason to believe that trial counsel was actually intoxicated during trial or that his performance fell below an objectively reasonable level").

Petitioner's claims of ineffective counsel involve factual questions regarding White's contemporaneous knowledge and decision making, as outlined above.  The court sought to expand the record on that point with a declaration from White, who states that he has "no recollection" of information learned from Massino or of strategic decisions made during Petitioner's trial.  (See White Decl. ¶¶ 5-7.)  See also Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (A "district court may use methods under Section 2255 to expand the record without conducting a full-blown testimonial hearing." (citing Blackledge v. Allison, 431 U.S. 63,

81-82 (1977))). The White Declaration does not, of its own weight, defeat Petitioner's

arguments, but the declaration does suggest that it would be futile to call White into court for live

testimony. The court has found that Petitioner's arguments lack support in the existing record.

White's sworn statement indicates that he has nothing to add to that record.

"As petitioner has failed to assert plausible claims or identify legitimately disputed issues

of fact, and because his claims may be evaluated by using his trial record and other submissions

of the parties to this proceeding, a hearing on his petition is not required." Sessa,

2011 WL 256330, at *57 (citations omitted).

### G. Summary

The court finds that White's prior representation of Massino created only a potential

conflict of interest at Petitioner's trial. Therefore, Petitioner bears the burden of showing that

any alleged ineffectiveness—conflict-related or otherwise—satisfied Strickland's requirements

of objectively unreasonable performance by counsel and prejudice to the defendant. Tueros,

343 F.3d at 592; Pepe, 542 F. App'x at 56. "In evaluating prejudice," the court is conscious of

its obligation to "look to the cumulative effect of all of counsel's unprofessional errors." Gersten

v. Senkowski, 426 F.3d 588, 611 (2d Cir. 2005) (citing Lindstadt v. Keane, 239 F.3d 191, 204

(2d Cir. 2001)). Petitioner has identified one sole instance of clear error on White's part, namely

White's failure to properly lay a foundation for the introduction of extrinsic evidence. See supra

Section IV.D.1. The court found that error to be neither egregious in nature nor prejudicial in

effect, particularly in light of White's vigorous advocacy and clearly defined defense strategies

before, during, and after trial. The court finds, therefore, that Petitioner's claim of ineffective

assistance of counsel fails to meet the required showing for an evidentiary hearing, and must be

dismissed.

## V.  OTHER NEW CLAIMS ASSERTED FOR THE FIRST TIME IN THE INSTANT PETITION

In addition to the claim of ineffective counsel, the Petition includes two other claims asserted for the first time on collateral review: Petitioner argues that the Government unlawfully withheld evidence and impermissibly relied on a "spy in the camp." (Pet. at 4-5.)  As explained above in Section II.A, these claims "may not be raised on collateral review unless the petitioner shows cause and prejudice." Massaro, 538 U.S. at 504.  The court finds that Petitioner has failed to show prejudice with respect to either claim, and therefore the court need not address Petitioner's proffered "cause" of ineffective counsel.  The court dismisses both claims as procedurally barred.

### A.  Unlawfully Withheld Evidence

Petitioner accuses the Government of violating the Fifth and Sixth Amendments by withholding "important documents and information containing exculpatory and impeachment information with respect to the key witnesses . . . and the government's theory of the case." (Pet. at 4.)  Petitioner's allegations under this claim, however, mirror the allegations under his claim of ineffective assistance of counsel.  That is, Petitioner points to certain evidence that did not appear at trial and argues both that White was ineffective for failing to pursue and present it, and also that the Government violated his rights by failing to produce it before trial.  (See Pet. at 4 (listing, inter alia, evidence concerning the Government's "suspicious conduct" theory in the DiFalco murder, alleged evidence of Massino's prior statements, a recorded conversation "concerning . . . Bartolotta's anger over an affair his girlfriend (DiFalco's daughter) was having," and the "identity of the investors" in the Giannini restaurant); Pet. Add'm at 24-25 (evidence of Vitale's prior inconsistent statements and his involvement in the Tuzzio murder); id. at 27-28, 32-33 (evidence concerning the "suspicious conduct" theory).)

55

The court need not assess the veracity of Petitioner's allegations that the Government impermissibly withheld some or all of the cited materials. The court has already determined that Petitioner did not suffer prejudice based on White's decisions not to present this evidence. See supra Sections IV.C, D. There is no basis for concluding that Petitioner suffered prejudice based on the Government's alleged failure to produce that same evidence.[31] Petitioner is thus procedurally barred from asserting this claim.

## B. Spy in the Camp

Petitioner accuses the Government of using cooperating witness Ambrosino as a "spy in the camp" by "insert[ing] him into the defense camp to read [Petitioner's] defense materials . . . in order to learn defense strategy and secrets." (Pet. at 5.) "To establish a [spy in the camp] Sixth Amendment violation," Petitioner "would have to show either that privileged information was passed to the government and prejudice resulted, or that the government intentionally invaded the attorney[-]client relationship and prejudice resulted." United States v. Baslan, No. 13-CR-220 (RJD), 2014 WL 3490682, at *3 (E.D.N.Y. July 11, 2014) (quoting United States v. Massino, 311 F. Supp. 2d 309, 313 (E.D.N.Y. 2004)); see also United States v. Dien, 609 F.2d 1038, 1043 (2d Cir. 1979).

Petitioner has not alleged that Ambrosino transferred any privileged information or otherwise invaded Petitioner's relationship with White. Petitioner's sole allegation related to this claim is that, while he and Ambrosino were housed at the same facility in 2004, they met in the

---

[31] The "prejudice" standard under Strickland is effectively identical to the prejudice standard under the "cause and prejudice" procedural default standard for Brady claims. Compare Strickland, 466 U.S. at 695 (A defendant must establish "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."), with Banks v. Dretke, 540 U.S. 668, 691 (2004) (explaining that "prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for Brady purposes." (citing Strickler v. Greene, 527 U.S. 263, 282 (1999))); Wearry v. Cain, — U.S. —, 136 S. Ct. 1002, 1006 (2016) ("Evidence qualifies as material" for Brady purposes "when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" (quoting Giglio v. United States, 405 U.S. 150, 154 (1972))).

prison library and had the following exchange: "Ambrosino asked me if I was going to plead guilty on the Perrino murder[.] I explained to Ambrosino that I was shocked by the charges, and that I could not take responsibility for crimes that I have not committed." (Pet'r Decl. at 35.) These allegations fail to establish a prima facie claim of "spy in the camp." As a result, Petitioner is unable to show prejudice, and this claim must be dismissed as procedurally barred.

## VI.    CLAIMS ALREADY RESOLVED ON DIRECT APPEAL

The Petition reasserts five claims that the Second Circuit rejected on Petitioner's direct appeal.[32] (Compare Pet. at 6-9 with Amato, 306 F. App'x 630.) As noted above in Section II.A, the "mandate rule bars re-litigation of issues already decided on direct appeal." Yick Man Mui, 614 F.3d at 53 (citations omitted). "[R]econsideration is permitted only where there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal." Reese v. United States, 329 F. App'x 324, 326 (2d Cir. 2009) (summary order) (quoting Chin v. United States, 622 F.2d 1090, 1092 (2d Cir. 1980)).

Petitioner "contends that he is entitled to raise [his claims] again in this context because of [] counsel's ineffectiveness in [developing] the record sufficiently" and "in the appellate argument, due, in part to his conflict of interests." (Pet. at 6.) District courts in this jurisdiction agree, however, that a petitioner generally "may not attempt to re-litigate claims he already

---

[32] These claims assert denial of Petitioner's rights under the Fifth and Sixth Amendments based on: (1) the court's exclusion of Vitale's prior inconsistent statements; (2) the court's corrective instruction regarding an inaccurate statement during the Government's rebuttal summation; (3) the jury charge with respect to the RICO statute of limitations; (4) the Government's efforts to bolster Tabbita's testimony on redirect and to file a sealed submission regarding his testimony during the trial; and (5) the court's instructions regarding the anonymous and partially sequestered jury. (Pet. at 6-9.)

raised on direct appeal by re-styling them as ineffective assistance claims."[33] <u>King v. United States</u>, No. 09-CV-4533 (RJD), 2013 WL 530834, at *3 (E.D.N.Y. Feb. 13, 2013).

Petitioner has failed to show that the arguments he presents on collateral review differ in any material way from the arguments that were rejected by the Second Circuit on direct appeal. He has not alleged specific deficiencies in White's appellate advocacy. He has not explained how his suggested alternative trial strategies would have affected the strength of his arguments on appeal. Nor has he offered any legal authority in support of his attempt to circumvent the mandate rule. The court declines to review arguments that have already been squarely presented to and rejected by the Second Circuit. These claims are dismissed.

## VII.   THE "CUMULATIVE EFFECT" CLAIM

Petitioner alleges that he was denied his Fifth and Sixth Amendment rights "by the cumulative effect of the errors in this case." The court has not found evidence of any constitutional error. Moreover, Petitioner has failed to cite any legal authority in support of his "cumulative effect" claim. This claim is dismissed.

---

[33] "The Second Circuit has not specifically addressed whether a petitioner moving under § 2255 can reargue the substance of claims already addressed on direct appeal by couching them in terms of ineffective assistance of counsel." <u>Barlow v. United States</u>, No. 13-CV-3315 (JFB), 2014 WL 1377812, at *7 (E.D.N.Y. Apr. 8, 2014). The Second Circuit has, however, barred petitioners from asserting on collateral review "a slightly altered rearticulation of [an <u>ineffectiveness</u>] claim that was rejected on his direct appeal." <u>Riascos-Prado v. United States</u>, 66 F.3d 30, 34 (2d Cir. 1997). District courts have applied a similar analysis to petitioners who seek to relitigate other types of substantive claims by alleging that those claims only failed on direct appeal due counsel's ineffectiveness. <u>See, e.g.</u>, <u>Slevin v. United States</u>, No. 98-CV-904 (PKL), 1999 WL 549010, at *3-4 (S.D.N.Y. July 28, 1999) (rejecting a habeas petitioner's attempt to relitigate "issues he already raised on appeal . . . by couching them in terms of ineffective assistance" because "[s]uch claims clearly fall under the 'slightly altered rearticulation' standard of <u>Riascos-Prado</u>"); <u>Barlow</u>, 2014 WL 1377812, at *7 ("agree[ing] with the analysis in <u>Slevin</u>").

## VIII.  CONCLUSION

For the reasons stated above, Petitioner's requests for discovery and an evidentiary hearing are DENIED and the Petition is DISMISSED.[34]

SO ORDERED.

                                                    s/Nicholas G. Garaufis
Dated: Brooklyn, New York                           NICHOLAS G. GARAUFIS
       April 5, 2017                                United States District Judge

_____

[34] Petitioner filed identical habeas petitions on both his criminal and habeas dockets.  This order resolves both instances of the Petition: Mot. to Vacate (Dkt. 1), Case No. 11-CV-5355, and Mot. to Vacate (Dkt. 1096), Case No. 03-CR-1382-13.